ALABAMA FOOTBALL, INC., an
Alabama Corporation, Plaintiff,

v.

L. C. GREENWOOD, an Individual,
Defendant.

Civ. A. No. 76–125.

United States District Court,
W. D. Pennsylvania.

May 30, 1978.

Wm. H. Dickey, Jr., Pittsburgh, Pa., for plaintiff.

Robert L. Potter, Pittsburgh, Pa., for defendant.

## OPINION

MARSH, District Judge.

Defendant, L. C. Greenwood, (hereinafter Greenwood) a professional football player, signed a contract to play football for the plaintiff, Alabama Football, Inc., (hereinafter AFI) beginning in 1975. AFI is an Alabama corporation which operated a professional football franchise known as the Birmingham Americans in the World Football League (hereinafter WFL). Neither Greenwood nor the Birmingham Americans played football in the WFL during 1975 or thereafter. AFI has brought this breach of contract action seeking to recover general damages and a $50,000 bonus it paid to Greenwood. In our opinion AFI is not entitled to recover either.

After review of the testimony and other evidence presented at the non-jury trial, and after consideration of the briefs and reply briefs submitted by the parties, the court makes the following findings of fact and conclusions of law.

## I

On May 31, 1974, AFI and Greenwood entered into a WFL player's contract (Pl. Exhibit 1). The contract is a standard form of five pages with blanks which were filled in to show the name of the WFL team, the name of the player, the term of the contract, the compensation, and the effective date of the contract.

The compensation section of the contract states that AFI will pay Greenwood a bonus in three installments: $25,000 upon signing of the contract, $25,000 in September, 1974, and $25,000 in April, 1975. In addition, Greenwood was to receive a salary of $90,-000 in 1975, $100,000 in 1976, and $110,000 in 1977. The parties indicated in the contract that they desired the contract to be effective on May 31, 1974, and that the contract was for a term of three years. If AFI failed to make any payment due to Greenwood under the contract, the payment was to be made by the WFL which then could exercise an option to have the contract assigned to the WFL as property of the league.

The WFL player's contract required Greenwood to report to AFI in good physical condition, to participate in their football games to the best of his ability, and to give his loyalty to the team and the WFL and to participate in their promotions and publicity (Pl. Exhibit 1, paragraph 4). Greenwood granted and assigned to AFI the right to use his name, likeness, and biographical sketch in connection with any matter associated with the team's or the league's business on publicity (Pl. Exhibit 1, paragraph 5).

Greenwood had played football during the 1973 season with the Pittsburgh Steelers in the National Football League. Testimony at trial indicated that all parties understood at the time the contract was signed that Greenwood would be obligated under an option clause in his 1973 Pittsburgh contract to play football during the 1974 season with the Steelers. Although not stated explicitly in the contract, it is clear from the testimony that the parties understood that Greenwood would not play football for AFI until the beginning of AFI's 1975 season.[1]

---

1. The language of paragraph 15.1 of the WFL form contract reads:

 "The Term of the Contract shall be for _____ Contract Years. The initial Contract Year shall commence on the effective date hereof and shall conclude on January 31, 1975." In this contract, the numeral "3" has been inserted in the blank. To the extent that this would tend to indicate that the term of this contract would not continue through the completion of the 1977 football season, the numeral "3" appears not to be an accurate reflection of the intention of the parties as shown in other portions of the contract (and in the testimony at trial).

When the contract was signed on May 31, 1974, Greenwood and his agent, Glenda Patterson, received checks totalling $25,000 from AFI representing the first installment of the bonus. The second $25,000 payment was received by Greenwood in September, 1974. AFI made no further payments to Greenwood.

AFI began its first and only football season on July 10, 1974. At AFI's request, Greenwood came to Birmingham to be present for the opening game (Transcript, p. 119). He also appeared at a reception where he met local bankers, political figures and members of the local press (Transcript, p. 125).

AFI's 1974 season was marked with financial difficulties. The AFI balance sheet for July 31, 1974, shows liabilities of $2,200,-000 and assets of $1,700,000. As the season continued, cash flow problems became severe. In October, 1974, AFI stopped paying Internal Revenue Service the money which AFI was withholding from its player's salaries for tax purposes. This money was used by AFI to pay salaries and other operating expenses (Transcript, p. 98). Eventually, AFI stopped paying the players their salaries. The players of the Birmingham Americans were not paid for the final five games of the season played between October 16, 1974, and November 13, 1974 (Transcript, p. 99). In mid-October, the team received notice from the WFL that AFI was in default on its payments to the league (Transcript, p. 115).

In spite of these difficulties, AFI had a good season on the football field. The Birmingham Americans won most of their games and qualified to play in the first WFL World Championship Game in December, 1974. Birmingham won the game, but on the following day the team's uniforms were seized by the sporting goods firm which had not received payment for them.

Shortly thereafter, the telephones at AFI's offices in Birmingham were disconnected (Transcript, pp. 82, 83). AFI's financial difficulties were widely reported in the press. Greenwood learned of them personally from his friend and former college roommate, Clarence Washington, who lived in Birmingham and who played football for the AFI team during most of the 1974 season (Transcript, p. 148).

The WFL, at a meeting of its Board of Governors held January 16, 1975, apparently passed a resolution declaring AFI to be in default on its payments to the league and cancelling AFI's membership in the WFL. On approximately January 22, 1975, WFL officials announced to the press that AFI's franchise in Birmingham had been terminated. At a subsequent meeting on February 13, 1975, the WFL Board of Governors ratified, confirmed and approved the previously passed resolution of default against AFI. The WFL authorized its officers to pursue negotiations with persons or entities capable of meeting the requirements of operating a WFL club in Birmingham in 1975 (Def. Exhibit N; Transcript, p. 80).

In a letter dated January 23, 1975, Lee H. Goldberg, an attorney who then represented Greenwood, advised the President of the WFL, Cris Hemmeter, that Goldberg had been unable to contact AFI because its telephone had been disconnected. Goldberg stated that he was giving written notice on behalf of Greenwood that AFI had failed to comply with two provisions of the WFL contract and he requested Hemmeter to respond (Pl. Exhibit 15; Def. Exhibit J).[2] In response, Goldberg received a telephone call from Donald J. Reagan, General Counsel of the WFL. Following this telephone conversation, Goldberg formally advised Reagan in a letter dated February 10, 1975, that Greenwood was terminating the contract which had been executed with AFI

---

2. In his letter, Goldberg stated that AFI had failed to pay Greenwood $25,000 due as a signing bonus and that AFI had failed to provide the funds for a 10-year interest free loan to which Greenwood was entitled under the contract. In fact, no demand had ever been made for the loan, and the two $25,000 payments which were due had been made. The misunderstanding resulted from the fact that Goldberg did not have a copy of the contract available at the time and that Greenwood had lost track of the money all of which went to his agent, Glenda Patterson, as part of an unsuccessful investment scheme.

the previous May 31 (Pl. Exhibit 2). Thereafter, Greenwood and the WFL executed a mutual release and agreement not to sue. That agreement, which was signed by Reagan on March 10, 1975, and by Greenwood on March 18, 1975, released Greenwood from any further obligations to the WFL under the terms and conditions of the player's contract (Pl. Exhibits 4A and 4B).

In a mailgram subsequently sent to Goldberg on March 31, 1975, Reagan stated that he had been told that, contrary to previous statements by Goldberg, Greenwood had received a $25,000 installment payment in September, 1974. Reagan advised Goldberg that if this were true and if Greenwood's contract had not been breached by AFI, then the WFL stood ready to assume the player's contract (Pl. Exhibit 6).

At trial, AFI's Chairman of the Board William R. Putnam testified that he first learned of the possibility that Greenwood would not honor the player's contract in March or April, 1975, from his discussions with news reporters. He testified that AFI did not make the third $25,000 bonus payment on April 1, 1975, because of the questionable status of the Greenwood contract (Transcript, p. 45). Putnam acknowledged that as of April 1, 1975, AFI had no funds for the $25,000 payment but stated that he personally would have put up the money for AFI.

The first direct correspondence between AFI and Greenwood in 1975 occurred on April 18 when Putnam wrote to Greenwood's attorney Goldberg advising him that AFI intended to operate in the WFL during the 1975 season and that AFI considered its contract with Greenwood to be valid and binding (Pl. Exhibit 8). This letter from Putnam was prompted when he learned of an earlier letter Goldberg had sent to the Internal Revenue Service after Goldberg learned that the Greenwood contract was listed among the items to be sold by the Internal Revenue Service at a tax sale of AFI's assets. Goldberg had informed the IRS that any potential bidder should be advised that Greenwood's contract was in default and that Greenwood intended to terminate the contract. The tax sale never took place, and Goldberg's letter was turned over to Putnam.

At trial, Putnam admitted that as of the time of his letter to Goldberg on April 18, 1975, the AFI franchise had been cancelled by the WFL and the WFL had issued the Birmingham territory franchise to another corporation operating as the Birmingham Vulcans. He testified that at the time of the letter AFI was contesting the cancellation of its franchise (Transcript, p. 47) and that AFI intended to relocate and operate a team in some other city during the 1975 WFL season. Putnam wrote to Greenwood on May 16, 1975, stating that Putnam had developed an interest in the New York area and that Putnam would contact Greenwood "within the next two weeks to give you all of the details" (Def. Exhibit V). Greenwood testified that he did not hear from Putnam again. The evidence shows that AFI did not operate a team in 1975, and that the WFL ceased operation prior to completion of the 1975 season.

On June 18, 1975, Greenwood executed a contract to play football for the Pittsburgh Steelers in the National Football League during the 1975 season.

## II

As contemplated by the parties to the contract at issue here, Greenwood's duty to play professional football for the Birmingham Americans was dependent upon AFI's offering an appropriate setting in which the individual defendant could perform his services. By the very nature of the game, Greenwood could perform only if AFI provided a football team on which Greenwood could play.

Greenwood's repudiation of the contract prior to the time his performance was due excuses AFI's abandonment of its responsibilities under the contract. After the repudiation it was no longer necessary for AFI to perform or to tender performance. Nevertheless, it remains a condition precedent to AFI's right to recover damages under the contract that AFI prove

that it would have had the willingness and ability to perform if there had been no repudiation. See 4 *Corbin on Contracts* § 978; 11 *Williston on Contracts* § 1334 at n. 4. See also the description of plaintiff's proof in *Waters v. Weintraub*, 255 Ala. 530, 52 So.2d 510, 514 (1951). On this point, AFI has failed to shoulder its burden. AFI has not proved that at the time of Greenwood's repudiation it had the ability to perform substantially its responsibilities under the contract.

The evidence is uncontradicted that by the end of 1974 AFI's financial situation was bleak. AFI had been unable to pay players who had participated in the 1974 season, the corporation's liabilities exceeded 1.5 million dollars, the team had been forced to vacate its coaches' offices for non-payment of rent, and the team uniforms had been repossessed following the championship game. Giving AFI the benefit of every doubt, these factors may not have made it an absolute certainty that AFI would be unable to perform its duties to Greenwood under the contract. But, these difficulties were compounded by AFI's loss of its professional football league franchise. It was shown by a fair preponderance of the evidence that in early 1975, the WFL acted to stabilize its own shaky financial position by terminating AFI's franchise and revoking AFI's league membership.

Although AFI now contends that this termination was unfair, the WFL's right to take such action was spelled out in the Membership and Franchise Agreement signed by AFI and the WFL on January 13, 1974 (Def. Exhibit BB). That agreement conditioned AFI's membership in the league on the payment of a $500,000 entry fee, which was scheduled to be paid in a series of installments, and an initial operating assessment of $100,000. In Paragraph 8.6, AFI agreed that any failure to meet these obligations could subject AFI to

> "revocation of WFL membership, revocation of the WFL franchise, and forfeiture to the WFL of all tangible and intangible assets necessary to operate a WFL football club in [AFI]'s territory."

The WFL By-Laws specifically define the "assets necessary to operate a WFL club" as including players' and coaches' contracts. By-Law 8.1.3 (Court Exhibit No. 1; Def. Exhibit AA).

On October 17, 1974, the WFL notified AFI that AFI was in default on payments to the league totalling $151,635.97 and that AFI's membership would be terminated and its franchise revoked unless the default was cured by October 21, 1974 (Def. Exhibit C). AFI responded by stating that it would appeal the default decision, and AFI subsequently requested a conditional reinstatement. This reinstatement was granted until the meeting of the WFL Board of Governors scheduled for January 16, 1975 (Def. Exhibit I). At that meeting, according to the WFL's minutes, a resolution was adopted declaring that the WFL membership and franchise held by AFI was in default on its league payments and that therefore the membership was cancelled, the franchise terminated and the territory released. The League President was authorized to take appropriate action to issue a new membership including the Birmingham territory to another entity (Transcript, pp. 329–330). Approximately one week later, the League President and the League Secretary announced to the press in Birmingham that the franchise of the Birmingham Americans had been revoked (Transcript, p. 334).

In a letter to the League President, AFI Chairman Putnam took exception to the statements that the WFL had taken over the Birmingham franchise (Def. Exhibit M), and in a subsequent telegram to the WFL, Putnam objected to the minutes of the January meeting as inaccurate. At the Board of Governors meeting on February 13, 1975, Putnam's telegram was read and a resolution was adopted stating:

> "the cancellation of the WFL Membership previously held by Alabama Football, Inc., the termination of its Franchise and the release of its Territory (Birmingham, Alabama) is hereby ratified, confirmed and approved;"

(Def. Exhibit N).

AFI argues that the termination was improper, but admits that it has never chal-

lenged these actions by the WFL, and the fact remains that the termination left AFI without a franchise in a professional football league. AFI also argues, in post-trial briefs, that there is no proof that the WFL ever formally invoked the forfeiture penalty which would cause all of AFI's assets including the contracts of players and coaches to be forfeited to the WFL. Although Greenwood has introduced no evidence to prove that a formal resolution was adopted by the WFL invoking the forfeiture option, testimony on behalf of AFI supports the view that such a forfeiture in fact did occur. AFI's Chairman Putnam testified that in February 1975, a separate corporate entity operating as the Birmingham Vulcans took over the assets of AFI by paying $25,000 to the WFL (Transcript, p. 109). AFI's team, the Birmingham Americans, operating under Coach Jack Gotta had conducted their 1974 pre-season training camp at Merian Institute in Birmingham. Putnam testified that the Birmingham Vulcans opened their training camp at the Merian Institute in June, 1975 with "Jack Gotta and the coaches and the same players that were there in '74." The difference was that the corporate entity AFI was not part of the 1975 training camp (Transcript, p. 108).

The termination of AFI professional football franchise frustrated the object of AFI's contract with Greenwood. There is no evidence that Greenwood caused AFI's insolvency, nor is there any evidence that either party contemplated or assumed the risk of franchise termination when the contract was signed. This would appear to be an appropriate situation for application of the doctrine of commercial frustration recognized in Section 288 of the *Restatement of the Law of Contracts*.[3] Indeed, in a case involving a contract between AFI and another prospective WFL football player, the United States District Court in Dallas, held:

"[I]t is undisputed that the dissolve of Alabama [Football, Inc.]'s team and the World Football League has made performance of the remaining unexecuted four-fifths of the contract impossible. Accordingly, the parties are excused from further performance in compliance with the contract."

*Alabama Football, Inc. v. Wright*, 452 F.Supp. 182, 185 (Civil Action No. CA-3-75-1545-D; October 20, 1977, N.D.Texas).

 The particular contract at issue between AFI and Greenwood, however, is governed by the law of Alabama, and this court is reluctant to apply the doctrines of commercial frustration or impossibility without precedent from the courts of that state. We have found no such authority dealing with commercial frustration or with impossibility of performance in a situation similar to the instant case. Nevertheless, in light of AFI's failure to prove its ability to perform at the time of the repudiation, AFI is precluded from any recovery of damages. Alabama law does allow AFI to seek restitution of the consideration paid to Greenwood. See 4 *Corbin on Contracts* § 979.

### III

Under a theory of restitution, AFI seeks return of the $50,000 paid to Greenwood as a bonus. Greenwood argues that restitution is not available to AFI because, in exchange for the $50,000, he executed the contract and thereby rendered the agreed equivalent performance which corresponded to the payment of the bonus.

Greenwood submits that the bonus was paid as a "signing bonus" as that term is customarily used in professional sports to mean a bonus paid to the player for his merely executing the contract. In support of this position, Greenwood points to nota-

---

**3.** Section 288 of the Restatement provides:
"FRUSTRATION OF THE OBJECT OR EFFECT OF THE CONTRACT.
Where the assumed possibility of a desired object or effect to be attained by either party to a contract forms the basis on which both parties enter into it, and this object or effect

is or surely will be frustrated, a promisor who is without fault in causing the frustration, and who is harmed thereby, is discharged from the duty of performing his promises unless a contrary intention appears."

tions on the two checks totalling $25,000 which were prepared and issued by AFI's President on May 31, 1974, and which were given to Greenwood at the time he signed the contract. One check, made out to a third-party on Greenwood's behalf, bears the notation "Part bonus for signing contract (L. C. Greenwood)" and the other check made out to Greenwood personally, indicates "Bonus for Contract" (Def. Exhibit II). AFI argues that the contract was not divisible, but rather was one entire contract calling for a total compensation of $375,000 in exchange for three years of service as a professional football player.

Paragraph 3 of the standard WFL Player's Contract signed by Greenwood and AFI is labeled "Compensation" and reads as follows:

"Except as modified by any other paragraph of this Contract, Club will pay to Player, for his performance described hereunder the following salary:"

In Greenwood's contract with AFI, the following terms were typed into the blank on the contract form:

"$25,000.00 Bonus due upon signing—
$25,000.00 due Sept. 1, 1974
April 1, 1975 $25,000.00 Bal due on Bonus
1975 $90,000.00
1976 $100,000.00
1977 $110,000.00" [4]

Paragraph 4 of the standard WFL contract is labeled "Employment and Services" and states:

"Club employs Player as a Major League football player, and Player accepts such employment and agrees to perform to the best of his ability and provide, by way of

illustration and not limitation, the following services:

4.1 To report to Club in good physical condition and training at the time and place fixed by Club at the beginning of each Season." [5]

It further requires the player:

"4.2 To play and participate in, to the best of his ability, all practice sessions, scrimmages, League and other games scheduled by or for Club.

. . . . .

4.4 To stay in the best physical condition possible during the Season.

4.5 To give his loyalty to the League and Club and to participate in their promotions and publicity and to cooperate with their football and business activities."

Whether the parties have apportioned their performances into several pairs of agreed equivalents is a matter of contract interpretation. The above-quoted paragraphs require Greenwood to play football during an eight-month football season in each of three contract years. For each of the three contract years 1975, 1976 and 1977 a separate salary is designated.

These provisions support a conclusion that the parties apportioned the salary designated for each year as the agreed equivalent for the performance to be rendered by Greenwood during that particular contract year. Such a conclusion is also supported by the two provisions in the contract which deal specifically with the potential problem of a player who fails to perform adequately under the contract. Paragraph 7.1 states that if the player is not in appropriate physical condition at the beginning of the

**4.** Paragraph 3.3 provides that payments under paragraph 3.1 shall be in accordance with the club's normal payroll practices. In paragraph 11, the player authorizes the club to deduct from the payments due him under the contract the amounts required for player's income tax and other lawfully required withholdings. No taxes were deducted or withheld from the two $25,000 payments made to Greenwood in 1974. This $50,000 was listed on Greenwood's 1974 tax return as "Bonus for Signing Contract with WFL" (Pl. Exhibit 13).

**5.** The contract defines the term "Contract Year" to mean the 12-month period from February 1 to January 31 each year during the term of the contract. Season is defined as:

"that period of time in the Contract Year, not to exceed eight months, during which WFL Clubs practice and play regular season, playoff, championship and all-star games."

season, or if he fails to remain in appropriate physical condition during the season, the team has the right to suspend the player.

"On any such suspension, the salary payable to Player shall be proportionately reduced as the length of the period of disability during which, in the sole judgment of the Club's physician, the Player is not fit to play bears to the WFL Season."

Paragraph 12, which deals with "Standards of Performance," explains that player is competing with other players for a limited number of positions on the team's roster:

"If, at any time during the term of this Contract, in the sole opinion of the Club, Player's skill, performance, or conduct is not sufficient to enable him to stay on Club's active roster, or within some other League authorized numerical limit, Club shall have the right to terminate this Contract. Upon any such termination Club shall be liable to Player only for accrued expenses due him and that part of the compensation due him hereunder which the number of League games already played by Club during the Season of the termination bears to the total number of League games for that Season scheduled for the Club."

The language in paragraphs 7 and 12 and the contract provisions previously cited support our conclusion that the parties intended that in the event Greenwood failed to perform adequately, the agreed performances of the parties would be apportioned on a season-by-season, or on a game-by-game, basis.

Such an interpretation, however, necessarily raises the question of what performance was expected as the agreed equivalent of the bonus paid by AFI. AFI argues that the bonus was simply an advance payment of the salary Greenwood was to earn when he began playing football for AFI. If the bonus was an advance on Greenwood's salary which the parties intended would be returned to AFI if Greenwood failed to perform under the contract, then the parties failed to express that intention in their contract. This silence is significant because AFI must have realized that by making a $75,000 advance on a three-year salary of $375,000, it was creating a situation where if AFI exercised its contractual rights to suspend Greenwood without pay or to cut him from the team, Greenwood already would have received more than the compensation which was due him under a game-by-game apportionment of his salary. Yet the contract provisions which deal with AFI's right to terminate the contract if Greenwood failed to win a spot on the team (paragraph 12) and with AFI's right to suspend Greenwood without pay if he should fail to remain in good physical condition (paragraph 7.1) make no reference to return of the bonus money.

Greenwood argues that the performance intended as the corresponding equivalent of the bonus was Greenwood's execution of the contract. While no language in the contract states this intention explicitly the interpretation is consistent with the terms of the contract and with the apparent intent of the parties at the time of the signing, as shown by a preponderance of the evidence. Furthermore, there is significant legal authority which demonstrates that such an interpretation in professional sports contracts is neither uncommon nor inequitable.

Professor Arthur L. Corbin has recognized that in professional sports contracts it is not unusual for a team to offer a promise of a large bonus to induce a player to sign a specific contract:

"The signature of the promisee to that instrument constitutes the acceptance of the offer, the entire consideration for the offered promise, and the entire performance that is the agreed exchange for the 'bonus' money. . . . The transaction is in truth, a promise for a promise; but observe that although the employer has offered his promise of a 'bonus' in exchange for the player's promise to play, he has not offered the 'bonus' itself (the money) in exchange for the performance promised by the player (playing the game). Instead, he has offered his prom-

ise to pay the 'bonus' in exchange for the *making* of player's promise (his 'entering into' the bilateral service contract). When the player attached his signature to the service contract, he had performed an act that constituted the full agreed equivalent of the 'bonus' (the money payment)."

1 *Corbin on Contracts* § 70 at p. 297.

Although we have found no Alabama case law expressly supporting this interpretation of a signing bonus in a professional sports contract, the Supreme Court of Alabama has recognized that "contracts involving professional athletes are somewhat unique." *Alabama Football, Inc. v. Stabler*, 294 Ala. 551, 319 So.2d 678, 681 (1975). The Alabama court found that even though Stabler had never played football for AFI,

"the balancing of the equities would not require Stabler to return the [$70,000] received during the year 1974, since there was evidence to support a conclusion that Alabama Football, Inc. had received benefits under the contract which Stabler was entitled to be paid for."

319 So.2d at 681. Specifically, the court found that by signing a contract in 1974 to play football with AFI beginning in 1976 Stabler benefited AFI which exploited his notoriety as a successful professional football player to gain publicity for the new WFL team and to sell tickets to ball games played in 1974.

The evidence here indicates that AFI similarly benefited from Greenwood's signing a contract to play football in Birmingham in future years. Greenwood, a native of Mississippi who played college football in Arkansas, was selected as an All-Pro NFL defensive lineman following the 1973 National Football League season. Greenwood subsequently played in the NFL Pro Bowl Game in January, 1974. He was an established professional football player at the time he signed the contract in May, 1974 granting AFI exclusive rights to his football services and non-exclusive rights to use his name for publicity purposes.

While Greenwood was not expected to play football for AFI until 1975, AFI made use of Greenwood's name during 1974. Each of the game programs for the Birmingham Americans' games of 1974 listed Greenwood among other players on a page captioned "What's in the future for the WFL." The programs also contained an item captioned "Coming Attractions" which read as follows during the early part of the 1974 season:

"It's going to be great this year, but you 'ain't' seen nothing yet.

In 1975, there will be tight end Jim Mitchell from the Atlanta Falcons, defensive end L. C. Greenwood of Pittsburgh Steelers, wide receiver Ron Jessie from Detroit, running back-wide receiver Mike Montgomery of Dallas, and Jimmy Tell, linebacker from Detroit, and others that can't be announced at this time.

Then, in 1976 quarterback Ken Stabler, the man many Alabama fans believe to be the greatest Crimson Tide quarterback of all, joins the Americans.

'We've signed others that we can't announce yet,' said Chairman of the Board Bill Putnam. 'The reason we can't announce them is that the players have asked us not to. They don't want their current coaches to know for one reason or another.'"

(Def. Exhibit U–3).

Later in the season, "Coming Attractions" was revised to read:

"It has been established without a doubt that the Birmingham Americans have the talent to win in 1974 in this inaugural season of the World Football League. But, what about the future?

It's well taken care of, thank you.

Beginning in 1974 (sic), many veterans of the more established National Football League will be moving to Birmingham. Defensively, there's L. C. Greenwood of the Pittsburgh Steelers and Pat Toomay of Dallas; cornerback Ray Easterling of Atlanta and a couple of guys that will remain nameless at this point at their request. . . ."

(Def. Exhibit U–8).

These program references demonstrate that the mere execution of the contract by an established player such as Greenwood

had promotional value which AFI was able to exploit.

It appears from the evidence that AFI benefited from Greenwood's execution of the contract. We conclude that the execution of the professional football contract by Greenwood more than a year before he was to begin playing football for AFI and the use of his name for promotional purposes by AFI during the 1974 season constitute adequate consideration to support the bonus paid to Greenwood.[6] The bonus was intended as the agreed exchange for performance expected of Greenwood prior to the time he began playing football, namely, execution of the contract.

Where a specific portion of a defendant's performance, such as the execution of the contract, has been apportioned as the equivalent of a part of plaintiff's performance, such as payment of the bonus, plaintiff is not entitled to restitution if the defendant has rendered the apportioned consideration in full. *Restatement of the Law of Contracts* § 351; 5 *Corbin on Contracts* § 1111. With respect to that particular performance which Greenwood was to render in exchange for the bonus, we conclude that there was no breach by Greenwood, and that therefore AFI cannot recover. AFI's request for return of the $50,000 in bonus payments made to Greenwood during 1974 will be denied and judgment will be entered for Greenwood on that claim.

Greenwood produced no evidence in support of his counterclaim. We conclude that the counterclaim is without merit, and therefore judgment will be entered in favor of AFI on the counterclaim.

An appropriate order will be entered.

---

6. In *Alabama Football, Inc. v. Wright,*, 452 F.Supp. 182, 184 (CA–3–75–1545–D, N.D.Texas, October 20, 1977) (appeal pending), the court found that the bonus paid to a prospective WFL football player was paid "in exchange for a fully performed act, Wright's signing of the contract." The court added that even assuming the contract required more than execution of the contract, the benefits accruing to the plaintiff upon execution of the contract would provide ample consideration to support the bonus payment.