In re SILBERMAN, INC., t/a Wyman, Inc., Risoli, Inc., Dalsimer's, Inc., and Duttly, Inc., Debtors.

SOUTH AMERICAN SHOE CORP., Plaintiff,

v.

Sidney L. KURTZ and Gene Gisburne, Receivers/Defendants,

and

Sol Silberman and Renee Silberman, Intervenors/Defendants,

and

American Bank & Trust Co. of Pa., Intervenors/Defendants.

SOUTH AMERICAN SHOE CORP., Plaintiff,

v.

Sidney L. KURTZ and Gene Gisburne, Receivers/Defendants.

Bankruptcy Nos. 75–610 to 75–614.

United States Bankruptcy Court, E.D. Pennsylvania.

May 13, 1983.

Jerome J. Verlin, Philadelphia, Pa., for plaintiff, South American Shoe Corp.

Edward Cohen, Philadelphia, Pa., for the receiver, Sidney L. Kurtz.

David T. Sykes, Marjorie O. Rendell, Philadelphia, Pa., for American Bank & Trust Co.

Lawrence R. Lesser, Louis J. Sinatra, Blue Bell, Pa., for Sol Silberman, Renee Silberman and Silberman, Inc.

Lawrence J. Lichtenstein, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for the Creditors' Committee.

Marvin Krasny, Philadelphia, Pa., for receivers, Sidney L. Kurtz and Gene Gisburne.

OPINION

By EMIL F. GOLDHABER, Bankruptcy Judge:

The issue at bench is whether the plaintiff's two complaints against the receivers should be granted. We conclude that both complaints should be denied and that the counterclaims asserted by the intervenors against the plaintiff should be granted.

The facts of the instant case are as follows:[1] On April 4, 1975, Silberman, Inc., t/a Wyman, Inc., Risoli, Inc., Dalsimer's, Inc. and Duttly, Inc. ("the debtor"), filed a petition under Chapter XI of the Bankruptcy Act ("the Act").[2] On April 8, 1975, Gene Gisburne[3] and Sidney L. Kurtz ("the receivers") were appointed as receivers for the debtor's estate. As of April 4, 1975, the debtor owed American Bank and Trust Company of Pennsylvania ("the bank") the sum of $1,326,506.00, which debt was secured by: (1) all of the debtor's corporate stock; (2) all of the corporate stock of Duttly, Inc.; and (3) all of the inventory and "proceeds" of the debtor and its affiliated corporations.[4] The aforesaid debt was personally guaranteed by Sol and Renee Silberman ("the Silbermans") who were the majority shareholders of the debtor, and by the debtor's affiliated corporations.[5] On August 12, 1975, the debtor, the bank, the Silbermans (in their individual capacities), the receivers and South American Shoe Corporation ("South American") entered into an agreement ("P–1") wherein South American agreed, *inter alia,* to pay the bank the sum of $315,000.00 and the bank, in consideration thereof, agreed to release the Silbermans from their aforementioned

1. This opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

2. Although the Bankruptcy Act has been superseded by the Bankruptcy Code as of October 1, 1979, the provisions of the Act still govern petitions filed before that date. The Bankruptcy Reform Act of 1978, Pub.L. No. 95–598, § 403, 92 Stat. 2683 (1978).

3. Gene Gisburne died after the filing of the instant complaints. However, we will frequently use the term "receivers" throughout this opinion.

4. *See* Exh. P–34 (Stipulation of Facts at ¶ 2).

5. *Id.* at ¶ 3.

individual liability to the bank.[6] In accordance with paragraph 1(a) of P–1, South American deposited the sum of $100,000.00 with Adelman and Lavine, Esquires, attorneys for the receivers, for the bank's benefit pending confirmation or rejection of the debtor's plan of arrangement ("the plan").[7] South American also agreed, pursuant to paragraph six (6) of P–1, to fund the debtor's plan. In exchange for these promises, the bank agreed to convey to South American all of the debtor's stock (which had been pledged to the bank by the Silbermans) that the Bank had in its possession at the time of the confirmation of the plan. Furthermore, the debtor and the receivers agreed to deliver the inventory and cash existing at the time of confirmation to South American. On that same day, the debtor, South American and the Silbermans executed an additional agreement ("P–2") wherein South American agreed to pay the Silbermans the sum of $100,000.00 and the Silbermans, in exchange therefor, agreed to endorse all of their stock in the debtor, which was being held by the bank, to South American.[8] On the following day, August 13, 1975, Marvin Krasny, acting as counsel for the receivers, wrote a letter ("P–3") to South American wherein he agreed, *inter alia,* that the receivers would not "close, vacate or otherwise dispose of any stores or leaseholds without court approval and prior notification to you [South American]."[9]

Thereafter, by letter dated September 9, 1975, approximately one month after the P–1, P–2 and P–3 documents were executed, South American advised counsel for the receivers that it would no longer abide by the P–1 and P–2 agreements for the stated reason that the receivers had breached the "agreement"[10] entered into on August 13, 1975, by their alleged closing of

five (5) of the debtor's stores.[11] As a result of this refusal to perform, South American neither paid the bank the $315,000.00 as agreed to in P–1[12] nor paid the Silbermans the $100,000.00 as promised in P–2.

Nevertheless, on November 26, 1975, South American filed two complaints against the receivers, one of which complaints ("the money complaint") demands the return of the $100,000.00 delivered by South American to the receivers' counsel in accordance with paragraph 1(a) of P–1.[13] The second complaint ("the shoe complaint") arose out of a transaction wherein South American delivered shoes, allegedly at the receivers' request, to the debtor on consignment. South American, in that complaint, demands judgment for the "agreed" purchase price of the consigned shoes and seeks an order directing the receivers to account to South American for all the consigned shoes sold by them or the debtor and for all the shoes in their possession which were still unsold. South American further demands that all the unsold shoes be turned over to them.

Following South American's refusal to perform, the bank objected to the confirmation of the debtor's plan since it had agreed to permit a plan to be confirmed based upon the understanding that it would receive the $315,000.00 from South American pursuant to P–1. When the $315,000.00 was not received, the bank became unwilling to agree to confirmation unless it received additional money. Thereafter, negotiations ensued between the bank and the Silbermans which resulted in the execution of an agreement dated December 1, 1972, whereby the Silbermans paid to the bank the sum of $104,750.00 in consideration for the release of their individual liability to the bank and the withdrawal of the bank's objections to

---

6. *See* Exh. P–1.

7. *See* Exh. P–1 at ¶ 4.

8. *See* Exh. P–2.

9. *See* Exh. P–3 at ¶ 3.

10. *See* the discussion of P–3 in the text *infra.*

11. *See* Exh. P–6.

12. However, the bank did receive the $100,-000.00 deposited by South American pursuant to paragraph 1(a) of P–1 from Adelman and Lavine on November 20, 1975. *See* Exh. P–34 at ¶ 9.

13. *See* note 12 *supra.*

confirmation.[14] South American also withdrew its objection to the confirmation of the plan provided that the bankruptcy court would maintain jurisdiction over the proceedings in regard to the lawsuits involving P–1, P–2 and P–3 and the lawsuits concerning the alleged consignment of shoes from South American to the debtor. The plan was confirmed on December 3, 1975, and an amended plan was confirmed on March 20, 1978.

On December 16, 1975, the debtor and the Silbermans filed a motion to intervene and on December 31, 1975, said motion was granted and the debtor and the Silbermans were joined in the money complaint of South American as parties defendants. On July 15, 1976, the bank also filed a motion to intervene and on November 26, 1976, said motion was granted and the bank was also joined in the money complaint as a party defendant.

On December 12, 1975, the receivers filed an answer and counterclaim to the money complaint and demanded judgment on that counterclaim in the sum of $344,473.00, said amount representing operating losses and the loss of leases allegedly resulting from South American's failure to perform under P–1. On December 30, 1975, the receivers moved to dismiss the shoe complaint.[15] On January 29, 1976, the Silbermans filed an answer and counterclaim to the money complaint and demanded judgment on that counterclaim in the amount of $200,000.00. On December 13, 1976, the bank filed an answer and counterclaim to the money complaint and demanded judgment on that counterclaim in the amount of $78,938.00. On November 14, 1979, the Silbermans and the debtor filed an amended answer and counterclaim to the money complaint and demanded judgment on said counterclaim in the amount of $200,000.00. On that same day, the Silbermans and the debtor also filed a cross-claim against Sidney L. Kurtz, the surviving receiver, in the sum of $500,000.00.

## I. KRASNY'S AUTHORITY TO ENTER INTO CONTRACTS FOR THE RECEIVERS

■ South American contends, inconsistently, that Marvin Krasny, counsel for the receivers, had no authority to enter into the P–1 agreement. On the other hand, it relies on P–3 (and the alleged breach thereof),[16] also signed by Krasny on behalf of the receivers, as the basis for both instituting suit against the receivers and for refusing to perform its obligations under P–1 and P–2.[17] To this, we simply conclude that one can't have one's cake and eat it too. Besides having expressly signed both P–1 and P–3 as counsel "for the receivers", Krasny explained his relationship with the surviving receiver as follows:

My relationship with Mr. Kurtz—and this is not the first time that I have represented him in a Chapter XI proceeding, but probably about the sixth or seventh—was that Mr. Kurtz took care of the operation of the business. He was a retired businessman who was not interested in what to do as far as anything about going to creditors' meetings, legalities, legal problems. His problem was strictly as an operations man and making the decision as to operating the business. He left to me the decisions involving anything legal, such as funding the plan or what had to be signed in court and what did not have to be signed in court.[18]

N.T. 5/21/82 at 186.

In addition to this long-standing course of dealing with his client, Krasny testified

---

**14.** *See* Exh. P–19.

**15.** On June 13, 1979, an order was entered permitting Adelman and Lavine to withdraw as counsel for the surviving receiver, Sidney L. Kurtz, in view of the fact that Marvin Krasny, one of the receivers' attorneys, was to appear as a witness in the instant proceeding.

**16.** *See* Exh. P–6 (letter of September 9, 1975).

**17.** *See* South American's Findings of Fact at ¶ 6 and ¶ 11.

**18.** Marvin Krasny testified that Gene Gisburne, the co-receiver, was ill during the negotiations surrounding the execution of P–1 and that, as a consequence of that illness, Krasny dealt almost exclusively with Sidney Kurtz (N.T. 5/21/82 at 186).

that Sidney Kurtz ratified the P–1 agreement either on the day it was executed or on the following day (N.T. 5/21/82 at 186–87). Kurtz himself testified that he did, in fact, learn of the P–1 agreement sometime after its execution (N.T. 5/20/82 at 62).

Even if we were to assume that the receivers did not, in fact, grant Marvin Krasny the power to legally bind them, we point out that the Supreme Court of Pennsylvania has stated:

Apparent authority is power to bind a principal which the principal has not actually granted *but which he leads persons with whom his agent deals to believe that he has granted. Persons with whom the agent deals can reasonably believe that the agent has power to bind his principal if,* for instance, the principal knowingly permits the agent to exercise such power *or if the principal holds the agent out as possessing such power* (emphasis added).

*Revere Press, Inc. v. Blumberg,* 431 Pa. 370, 375, 246 A.2d 407, 410 (1968) quoted in *William B. Tanner Co., Inc. v. WIOO, Inc.,* 528 F.2d 262, 266 (3d Cir.1975).

In short, we find it incredulous that any party to these proceedings, and especially South American, could now maintain that Marvin Krasny, one of the major architects of the much-negotiated P–1 agreement and the P–3 letter, had no authority of any kind to act on behalf of the receivers.

## II. THE P–3 "AGREEMENT"

■ We note at the outset that South American has sued the receivers to recoup the $100,000.00 deposit made for the bank's benefit pursuant to paragraph 1(a) of *P–1* based upon the alleged breach of *P–3,* a document to which the bank is not a party. P–3 provides in its entirety: [19]

August 13, 1975

South American Shoe Corp.
456 Sylvan Avenue
Englewood Cliffs, NJ 07632
Re: *Silberman, Inc.*
Gentlemen:

As counsel for the receivers Sidney Kurtz and Gene Gisburne in the chapter proceedings titled Silberman, Inc. et al bankruptcy No. 75–610, it is hereby agreed on behalf of the receivers, until date of confirmation of the proposed plan arrangement, as follows:

1) The receiver will pay all rents of current leaseholds, salaries and expenses as has been previously directed by the Court, taxes and utilities.

2) Receiver will incur no other obligation other than those enumerated above and will not purchase any additional merchandise without prior approval.

3) Receiver will not close, vacate or otherwise dispose of any stores or leaseholds without Court approval and prior notification to you.

4) Receiver represents that the rent is being paid for the leaseholds enumerated in the attached schedule, and that he will continue to pay such rent, provided he has the necessary funds available. Furthermore, in the event the receiver shall have insufficient funds to pay the rent, he shall contact you for an advance of such funds prior to the closing of any leasehold.

Sidney L. Kurtz,
Gene Gisburne,
Receivers of Silberman, Inc.
By: /s/ Marvin Krasny
MARVIN KRASNY
Attorney for Receivers

*See* Exh. P–3.
Simply put, P–3 is not a contract—it is not an agreement, for consideration, between two or more parties. All of the promises contained in P–3 are made by the receivers and they received no benefit in exchange for those promises. Certainly, South American incurred no detriment under the terms of the P–3 letter—it did not promise to do anything nor did it agree to forbear from doing anything. Moreover, we fail to see how P–3 can be construed as a modification of either P–1 and P–2 when the parties to all three documents are different. In addi-

**19.** There are hand-written additions to P–3, but these notations are illegible.

tion, Krasny, one of the authors of P–3, testified that the matters set forth in P–3 were not discussed on August 12, 1975, when P–1 and P–2 were executed (N.T. 5/21/82 at 190; 5/25/82 at 299). Furthermore, there was no evidence whatsoever that the promises contained in P–3 were to be somehow incorporated as terms, promises or conditions of performance of either P–1 or P–2. Finally, since South American had already executed both P–1 and P–2 on August 12, 1975, we must conclude that South American did not act in reliance upon any of the unilateral promises set forth in P–3.

■ But assuming, *arguendo,* that P–3 is a legally binding agreement and that it somehow binds non-parties such as the Silbermans and the bank and that it affects, further, the rights of those non-parties contracted for under separate agreements, we conclude that the grounds asserted by South American in its letter of September 9, 1975, for refusing to perform, i.e., the alleged closings of five stores, are wholly without merit. The debtor, at the time the P–1, P–2 and P–3 writings were executed, was a corporation consisting of approximately fifty-two (52) shoe stores (N.T. 5/20/82 at 38). South American's "proof" that these five stores were closed *and* that the closing of those stores constituted a material breach of P–1 and P–2 consisted of [20] (1) the testimony of South American's president that he had personal knowledge of the closing of one store and that he did not know for how long a period of time that store was closed (N.T. 5/20/82 at 41); (2) the testimony of the receiver, Sidney L. Kurtz, that he didn't remember which stores were closed, when they were closed, or how they were closed (N.T. 5/20/82 at 72); and (3) the testimony of Marvin Kras-

ny that one of the stores referred to in South American's letter of September 9, 1975 (1531 Chestnut Street), as being closed was, in fact, open and that South American was aware of this fact (N.T. 5/21/82 at 133–37).[21] To the contrary, the record establishes that only two stores were closed following the execution of P–1, P–2 and P–3 and that both these stores were closed by their landlords, not by the receivers, and reopened on the same day that they were closed (N.T. 5/25/82 at 246–47). South American produced no evidence whatsoever that the other three stores referred to in its letter of September 9, 1975, were closed between August 13, 1975, and September 9, 1975. Rather, the only testimony produced at trial relating to those three stores discloses that the three stores were open during the relevant time period (N.T. 5/22/82 at 247). Consequently, we conclude the temporary closing of two out of fifty-two stores was *de minimus,* was promptly cured and did not constitute a material breach of the contract.

## III. ANTICIPATORY BREACH

■ On September 9, 1975, counsel for South American sent a letter to Marvin Krasny, counsel for the receivers, which provided in its entirety:

September 9, 1975

Marvin Krasney, Esq.
Adelman and Lavine
2 Penn Center Plaza
Philadelphia, Pa. 19106

    Re: Silberman's Inc.—South American Shoe Corp.

Dear Mr. Krasney: [22]

You are hereby advised that your clients Sidney L. Kurtz and Gene Gisburne, receivers in the pending bankrupt-

---

**20.** *See Sgarlat v. Griffith,* 349 Pa. 42, 36 A.2d 330 (1944) (only a material failure of performance by one contracting party discharges the other party).

**21.** South American relies on Exhibit P–11, a letter from the controller for Sidney Kurtz to Kurtz himself, for support of its contention that the 1531 Chestnut Street was closed. In addition to saying that the Chestnut Street store

has been closed since July 30, 1975 (the relevant time period, however, is between August 12, 1975, the date P–1 and P–2 were executed, and September 9, 1975, the date of South American's refusal to perform), the letter states that three of the five stores (that South American alleges were closed) were never closed.

**22.** The misspelling of Krasny's name appears in the original.

cy matter of Silberman's Inc, et. al. (No. 75–610), *have breached the agreements entered into on August 12 [P–1] and August 13, 1975 [P–3], by virtue of their closing the following stores leased by Silberman's Inc., or its subsidiaries:*

a) Cherry Hill, N.J.—Dial Store;

b) Harundale Mall, Eastpointe Mall, and Towson Store, all in the Baltimore, Maryland area;

c) 1531 Chestnut Street, Philadelphia, Pa.

*Your client's intentional and wrongful conduct in closing the stores was in direct violation of their obligations to my clients, and in derrogation of their duties as receivers.*

*Demand is hereby made for the immediate return of the $100,000 sum, held by your firm in escrow, pursuant to agreement of August 12, 1975.[23] You are further advised that South American Shoe Corp., by reason of your clients breach of contract, has and will suffer substantial loss for which damages at law will be sought.*

**23.** It is clear that the receivers were not entitled to the $100,000.00 deposit. The express terms of P–1 provided that if the debtor, receivers, or the bank were unable to deliver confirmation of the plan and meet other various conditions, then the $100,000.00 *deposit would be applied to the purchase of certain leases rather than towards the acquisition of the debtor's stock:*

3. In the event the Debtor, Receivers, or the Bank are unable to deliver either a confirmation of the plan or *other conditions set forth in the agreement are not fulfilled or in the absence of an agreement being executed by South American Shoe and Sol and Renee Silberman, the sum of $100,000 will be applied to the purchase of the leases for the stores presently under negogiations with Butler Shoe and J.P. Shoe Corporation and it is agreed that, in such event, you will have the right and obligation to purchase (with no other obligation on the part of the Debtor other than an assignment of its existing interest) all of the leases subject to the offers of Butler's and J.P. Shoe Corp., copies of which offers are attached hereto, for the price of $200,000 and $100,000 respectively.*

4. The check for $100,000 delivered pursuant to 1(a) above shall be held by Adelman & Lavine for the benefit of the Bank and shall be endorsed and delivered to the Bank at such time as the plan is confirmed, or the

*By way of copies of this letter to the interested parties, all are hereby advised that South American Shoe Corp. shall proceed no further with funding the reorganization plan, and disclaims any obligations to any parties involved in this matter.*

*In order to avoid delay, request is made that your trust account check in the sum of $100,000 be sent, by return mail, to South American Shoe Corp., 456 Sylvan Avenue, Englewood, Cliffs, N.J. 07632; Att: Howard Goodman (emphasis added).[24]*

Yours truly,
HARRY and GEORGE G. COHN
by: /s/ Theodore R. Cohn
THEODORE R. COHN

*See* Exh. P–6.

Under Pennsylvania law, in order for the renunciation of a contract to rise to the level of an anticipatory breach, "there must be an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." *McClelland v. New Amsterdam Casualty Co.,* 322 Pa. 429,

leases are purchased pursuant to 3 above, as the case may be.

*See* Exh. P–1 at ¶ 3 and ¶ 4.

**24.** On September 12, 1975, Krasny responded to *South American's letter of*

September 9, 1975:

Dear Mr. Cohn [counsel for South American]:

This is to acknowledge receipt of your letter of September 9, 1975. In accordance with our telephone conversation, I advise you that I spoke with Sidney L. Kurtz, one of the Receivers, and according to him the only store that is closed is the Cherry Hill store and possibly the Plymouth Meeting store as in both of these stores the landlord has, according to Mr. Kurtz, physically removed us from the store and has changed the locks.

It is the position of the Receiver that the agreements of August 12 and August 13, 1975, have not been breached and, accordingly, the Receiver will not turnover the $100,-000.00 *deposited by South American Shoe Corp. in this proceeding.* I suggest that you bring appropriate action before the Bankruptcy Court to determine your rights to this fund. I am enclosing herewith a copy of the Certificate of Deposit indicating how these funds have been invested.

*See* Exh. P–7.

433, 185 A. 198, 200 (1936), quoted in *McCloskey & Co. v. Minweld Steel Co.,* 220 F.2d 101, 104 (3d Cir.1955). We have little difficulty in concluding that South American's letter of September 9, 1975, was an "absolute and unequivocal refusal to perform" under the P–1 and P–2 agreements. Furthermore, the fact that it was South American, rather than the debtor, the bank or the Silbermans, that commenced suit in this matter does not, we think, change the character of the anticipatory repudiation. We note that the bank, the debtor and the Silbermans all joined in South American's money complaint and filed counterclaims against South American. Moreover, in a similar situation, the Third Circuit Court of Appeals held:

> The record here reveals attempts by Tanner to secure WIOO's performance under the contracts following the telephone conversation of February 23, 1971 [the anticipatory breach]. Four months after WIOO refused to perform further, Tanner obtained local counsel to commence suit. This action began on March 13, 1972, more than a year following the referenced telephone conversation. Our finding that Pennsylvania no longer requires acceptance of an anticipatory breach leads to the conclusion that Tanner's efforts to secure performance by WIOO and its delay in filing its complaint are not fatal to its action.

*William B. Tanner Co., Inc. v. WIOO, Inc., supra,* at 271. Likewise, we conclude that the efforts of Krasny, the bank and the Silbermans to secure South American's performance under P–1 and P–2 do not change the nature of South American's breach.[25]

## IV. COURT APPROVAL

South American next contends that P–1 required the approval of the bankruptcy court and that the alleged failure to obtain said approval made P–1 void *ab initio,* thereby excusing South American from performing thereunder.[26] South American refers specifically to paragraph eight (8) of P–1 which provides:

> 8. In consideration of the above promises, *and upon confirmation* and your [South American] funding of the Debtor's plan of arrangement, the Bank shall convey to South American Shoe Company, or its designee all of its right, title and interest in the outstanding *stock* of Silberman, Inc. in its possession at the time of confirmation, and the Debtor and/or Receivers shall deliver the *inventory* at the time of confirmation, and the *cash* in the hands of the Receivers at the time of confirmation (emphasis added).

*See* Exh. P–1 at ¶ 8.

Section 313(2) of the Act provided:

> Sec. 313. Upon the filing of a petition, the court may, in addition to the jurisdiction, powers, and duties hereinabove and elsewhere in this chapter conferred and imposed upon it—
>
> (2) Upon such notice as the court may prescribe and upon cause shown, authorize the receiver or trustee, or the debtor in possession, to lease or sell any property of the debtor, whether real or personal, upon such terms and conditions as the court may approve;

Moreover, *Collier on Bankruptcy* states:

> Section 313(2) and Rule 11–54(b) confer upon the court jurisdiction to authorize the receiver or trustee, or the debtor in possession, to lease or sell any real or personal property of the debtor, upon cause shown, and upon such notice as the court may prescribe, and upon such terms and conditions as the court may approve.

8 Collier on Bankruptcy ¶ 3.16 at 214 (14th ed. 1978).

However, the fatal flaw in South American's argument is that while what was

---

**25.** We add further that South American's repudiation of the P–1 and P–2 agreements has the effect of excusing the receivers, the debtor and the Silbermans from their respective obligations under the P–1 and P–2 agreements. *See Alabama Football, Inc. v. Greenwood,* 452 F.Supp. 1191, 1194 (W.D.Pa.1978).

**26.** Counsel for South American admitted at argument that the P–2 agreement executed by South American and the Silbermans required no court approval (N.T. 2/15/83 at 10).

agreed to in P–1 (and specifically in paragraph 8) was a "sale of assets", the assets to be exchanged were, in large part, assets owned by the Silbermans as individuals (the corporate stock) and pledged to the bank in order to secure an indebtedness of the corporate debtor to the bank, and, as such, no court approval would have been required for that transfer.

■ In any event, we find it dispositive that the P–1 agreement, as primarily embodied in paragraph eight, was expressly conditioned upon confirmation of the debtor's plan, which would necessarily have invoked the imprimatur of the bankruptcy court. Therefore, to the extent that paragraph eight contemplates an exchange of assets belonging to the debtor (the inventory and cash), the court approval required by section 313(2) of the Act would have been exercised at the confirmation hearing. Consequently, we conclude that court approval of P–1: (1) was not required inasmuch as the contemplated exchange of the debtor's corporate stock between South American and the bank did not involve an asset of the debtor; and (2) was, in any event, provided for in regard to the intended transfer of those assets of the debtor (the inventory and cash) because said transfer was expressly conditioned upon confirmation of the debtor's plan.

## V. DAMAGES

Under Pennsylvania law:

> [t]he measure of damages for breach of contract is *compensation* for the loss sustained. The aggrieved party can recover nothing more than will compensate him. Plaintiffs should be placed as nearly as possible in the same position they would have occupied had there been no breach (emphasis in original).

*Lambert v. Durallium Products Corp.*, 364 Pa. 284, 287, 72 A.2d 66, 67 (1950).

In order for the bank and the Silbermans to recover damages under the P–1 and P–2 agreements, it must be shown that both parties had the willingness and ability to perform under those agreements had there been no repudiation by South American. *Alabama Football, Inc. v. Greenwood*, 452 F.Supp. 1191, 1194–95 (W.D.Pa.1978) citing *Corbin on Contracts* § 978; 11 *Williston on Contracts* § 1334 at n. 4. In this regard, Renee Silberman testified that she and her husband were ready, willing and able to transfer the corporate stock they owned in the debtor to South American following the execution of the P–1 and P–2 agreements with South American (N.T. 5/20/82 p. 101). In short, the record does not even suggest that the bank and the Silbermans had neither the willingness nor the ability to perform under the P–1 and P–2 agreements.

■ Had there been no breach by South American, the Silbermans would have been released from their $1,326,506.00 obligation to the bank [27] and they would have received the sum of $100,000.00 from South American in exchange for the transfer of their stock in the debtor to South American.[28] Instead, the Silbermans, because of South American's repudiation, had to negotiate an alternative arrangement with the bank and pursuant to that arrangement, the Silbermans paid the bank the sum of $104,750.00 and the bank, in turn, released the Silbermans from their obligation to the bank.[29] Consequently, we conclude that South American is liable to the Silbermans for the sum of $204,750.00—the loss of the cash consideration of $100,000 for the transfer of the stock as agreed to in P–2 and the loss of the satisfaction of the indebtedness to the bank, as provided for in P–1 whereupon, the Silbermans were required to pay to the bank the sum of $104,750.00 in discharge of that debt.

■ Had there been no breach by South American, the bank would have received $315,000.00 from South American in accordance with the terms of P–1 upon confirma-

---

**27.** *See* Exh. P–1 at ¶ 1(d).

**28.** *See* Exh. P–2 at ¶ 3.

**29.** *See* Exh. P–19.

tion of the plan.[30] Instead, through alternative arrangements, the bank obtained proceeds of $225,882.60.[31] Therefore, we conclude that South American is liable to the bank for the aforesaid deficiency—namely, the sum of $89,117.40.

## VI. THE SHOE COMPLAINT

■ With respect to its complaint against the receivers regarding the shipment of the shoes, South American alleges:

14. On September 8, 1975, Bankruptcy Judge Curtin approved an Order authorizing the Receiver to purchase shoes on consignment from SOUTH AMERICAN SHOE CORP. (P–8).

15. *Pursuant to that Order,* SOUTH AMERICAN SHOE CORP., on four separate dates, shipped 18,384 pair of shoes totaling $122,355 to the DIAL SHOE CORPORATION warehouse at 10975 Dutton Road, Philadelphia, Pennsylvania (P–23a, b, c, d) (N.T. 32, 160) (emphasis added) (citations in original).[32]

A review of the invoices clearly establishes, with one exception,[33] that the shoes were shipped prior to the September 8, 1975, order authorizing the receivers to purchase shoes. Moreover, while the receivers did acquire authorization to purchase shoes on September 8, 1975, South American did not produce a scintilla of evidence that the receivers did, in fact, place an order for shoes with South American. Rather, all the invoices indicate that the shoes, according to said invoices which were offered into evidence, were sold *by* South American *to* South American[34] and shipped to the Dial Shoe Corporation located on 10975 Dutton Road, Philadelphia, Pennsylvania. We fail to see what liability this creates in the receivers. No mention of the debtor or the receivers is made anywhere on any of the invoices. In addition, there is no evidence of a "consignment" deal being struck be-

tween the receivers and South American. Instead, the record supports the conclusion that the shipment of the shoes to the Dial Shoe Corporation was for South American's own account as purchasers made in contemplation of its impending takeover of the debtor corporation.

---

30. *See* Exh. P–1 at ¶ 1.

31. *See* Exh. P–34 at ¶ 13.

32. *See* South American's Findings of Fact at ¶ 14 and ¶ 15.

33. That invoice (# 2730) shows that merchandise was shipped on September 12, 1975, 4 days after the September 8, 1975 authorization.

34. South American's address appears on all the invoices as 456 Sylvan Avenue, Englewood Cliffs, New Jersey 17632.