**In re 222 LIBERTY ASSOCIATES, Debtor.**

**222 LIBERTY ASSOCIATES, Plaintiff,**

v.

**EESCO ELECTRIC, INC. and United States Fidelity and Guaranty Company, Defendants.**

**Bankruptcy No. 88–11535S.**
**Adv. No. 88–2193S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

June 23, 1989.

Joseph A. Prim, Jr., Paul J. Duca, Philadelphia, Pa., for defendants.

Stephen Raslavich, General Counsel, Philadelphia, Pa., William Goldstein, Sp. Counsel, Bensalem, Pa., for debtor.

Robert J. Casey, Philadephia, Pa., for Philip J. Banks.

Laurence J. Kaiser, Kronish, Lieb, Weiner & Hellman, New York City, for Donald L. Wolk.

Andrew N. Schwartz, Philadelphia, Pa., for Creditors' Committee.

## ADJUDICATION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. FINDINGS OF FACT

1. The bankruptcy case underlying this proceeding was commenced on May 3, 1988, when an involuntary Chapter 7 petition in bankruptcy was filed against 222 LIBERTY ASSOCIATES, the Debtor and Plaintiff in this lawsuit (hereinafter "the Debtor"), A consensual order for relief and an order converting this case to Chapter 11 were ultimately entered on September 8, 1988.

2. On November 10, 1988, the instant adversary proceeding was commenced by the Debtor against EESCO ELECTRIC, INC. (hereinafter "the Defendant," as it is the primary party defendant) and UNITED STATES FIDELITY & GUARANTY COMPANY (hereinafter "USFG"), (collectively the Defendant and USFG are referred to as "the Defendants."). After a series of continuances caused in part by disqualification of the initial general counsel of the Debtor and replacement of not only the original general counsel, but also the original special counsel appointed to litigate this pro-

ceeding, the proceeding was scheduled for trial on May 9, 1989, on a "must be tried" basis.

3. The trial was in fact commenced on May 9, 1989, and, after about two hours of testimony on that date, was completed after an additional full day of trial on May 15, 1989.

4. At the conclusion of the trial, the parties opted for a "fast-track" disposition schedule, eschewing preparation of a trial transcript and agreeing that the Debtor would submit proposed findings of fact, conclusions of law, and any supporting memoranda on or before May 26, 1989, and the Defendants would respond in kind on or before June 5, 1989. The parties complied with this proposed schedule.

5. The Debtor is a limited partnership which has been in the process of renovating its sole asset, an antiquated 12–story office building located at a desirable spot in center city, 110 South 16th Street, Philadelphia, Pennsylvania (hereinafter "the Building"), since its purchase in June, 1985.

6. The two general partners of the Debtor are Philip J. Banks (hereinafter "Banks"), who supervised the daily administrative affairs of the Debtor, and Donald L. Wolk (hereinafter "Wolk"), who provided most of the financing for the purchase of the Building. Differences have arisen between Banks and Wolk, *see In re 222 Liberty Associates, Cohen v. 222 Liberty Associates,* 99 B.R. 639 (Bankr.E.D.Pa. 1989), although Wolk has presently proposed a Plan of Reorganization which, in the increasingly unlikely possibility that it is confirmed, could resolve all outstanding disputes surrounding the Debtor.

7. In July or August, 1986, the Debtor solicited bids for electrical work on the Building. In so doing, it presented the Defendant, as a bidder, with drawings prepared by the Debtor upon which to base its bid. These drawings, with respect to the third through the twelfth floors, included the following statement: "Partitions—remove all partitioning not required by existing tenants or building core functions to conform to 'Typical Floor Plan.'"

8. After a review of the drawings and inspection of the Building, the Debtor prepared three Proposals for performing the work. These Proposals were incorporated into three separate "Contractor's Agreements" between the parties, the balance of which, appended to the Proposals, was prepared by the Debtor. Interpretation of and the extent of the Defendant's performance under these Agreements, executed by the parties on September 8, 1986, are the subject of this litigation.

9. The first Agreement (hereinafter "Agreement I"), contemplated the Defendant's replacement of the entire outmoded existing "two-phase" electrical system of the Building with a modern "three-phase" system, for a total price of $140,000.00.

10. Agreement I was bonded by a Performance Bond, guaranteeing all liability of the Defendant, issued by USFG on October 9, 1986. There was no bond in place in reference to any of the other contracts between the parties.

11. The second Agreement (hereinafter "Agreement II") contemplated installation of a fire alarm system "in accordance with the latest city of Phila.Codes" with "6 portable phones, 58 speakers, 18 pull stations, 28 smoke detectors and elev. recall," at a total cost of $35,650.00.

12. The third Agreement embraced three Proposals pertaining to supply of stairwell and exit lights and furnishing and installing several items pertaining to the heating, ventilation, and air conditioning system (hereinafter "HVAC") of the Building. The total cost for all items included in this Agreement was $33,345.00.

13. The Agreements each provided that periodic payments of up to ninety (90%) percent of the contracts would be paid while the work was in progress and that ten (10%) percent would be held as retainage until the work was completed satisfactorily. The Debtor's source of funds was a construction loan from Goldome Realty Credit Corporation (hereinafter "Goldome"), which paid the Defendant through a draw-down by the Debtor.

14. The Agreements did not include any provisions as to when work would be per-

formed, but it was understood by the parties that the Debtor desired all of the work to be done as soon as possible, and the Defendant accordingly commenced work immediately.

15. In October, 1986, the Defendant approached the Philadelphia Electric Company (hereinafter "PECO"), to arrange to energize the new system, which would be necessary at the completion of the work in the Building contemplated by Agreement I to allow the three-phase system to become functional. However, PECO advised the Defendant that it would not begin work necessary to energize the new power system unless and until the Debtor made arrangements to pay outstanding bills, and the Defendant so advised Banks. Banks informed the Defendant that he would make the necessary arrangements with PECO to pay the bills.

16. In addition to the three (3) Agreements referenced above, the parties entered into additional contracts on March 9, 1987, for electrical work to be done on the eleventh floor of the Building and contracts for extras on November 7, 1986, and February 4, 1987, which were performed without incident.

17. In April, 1987, the Defendant had completed almost all of the work under the additional contracts and had completed all of the work that could be done under the original Agreements without the system's being energized by PECO. However, the Debtor was unable to make arrangements with PECO to supply power to the Building at that time after all. As it developed, no arrangements were made until August, 1987, and the connection was not completed by PECO until October 27, 1987. Therefore, the Defendant, by apparent agreement of the parties, left the job site in late April, 1987.

18. The Defendant contended, throughout the period that it was working on the job, that dispatches of payments from Goldome that were intended for it were delayed by the Debtor. However, by June, 1987, correspondence sent to Goldome by the Defendant indicated that the Defendant had received ninety (90%) percent of the sums due under the Agreements.

19. At some time between April, 1987, and October, 1987, the Defendant, apparently frustrated by the unanticipated delay in the project and the previous payment problems, removed certain fuses and keys from electrical equipment that it had installed as part of the new three-phase system, without the Debtor's knowledge or consent, which it knew would prevent PECO from completing the street connection. Tyrone P. Ridlon (hereinafter "Ridlon), the Defendant's principal, initially contended that this action was taken for safety reasons and because he believed that the Defendant was entitled to remove its property. However, we find that, given the surreptitious manner in which this act was done, its sole purpose was, as Ridlon later admitted, to pressure the Debtor to guarantee the final payments to it as a condition for finishing its work in light of the Debtor's now-apparent financial problems.

20. On October 2, 1987, Banks wrote to Ridlon and demanded that the Defendant return to finish the job now that PECO was prepared to make the connection. Ridlon, by letter of October 9, 1987, responded that the Defendant would return to finish the job, which Ridlon estimated would take only three or four more days, only if the Debtor agreed to place the retainage representing the balance due in escrow with the Defendant's attorney.

21. Banks testified that he did not intend (or may not have had sufficient funds) to comply with this condition and proceeded to hire Stewart Electric, Inc. (hereinafter "Stewart") to replace the fuses and keys removed by the Defendant and prepare the system for PECO's connection. Banks testified that Stewart charged the Debtor $4,968.00 for this work and, over the Defendant's objection, identified a bill in this amount to support his testimony which we ultimately admitted into evidence.

22. Although PECO made its connection, the work necessary in the Building to connect the three-phase system which the Defendant was to install has never been completed, and the system is therefore not

operational. As a result, the Debtor continues to use the original two-phase system to provide electrical power to the Building. Banks testified that he has received estimates that it would cost approximately the amount of the retainage due, about $21,000, to finish the work. Therefore, the Debtor contends that it is not liable to pay the retainage to the Defendant.

23. Banks testified that, since October 27, 1987, when it made the street connection, PECO has billed the Debtor approximately $1,000 per month for electric service. He further testified that previous billings for the two-phase system had averaged about $250 per month. However, because the three-phase service has not been hooked into the electrical facilities for the Building, the Building is still running on the old two-phase service. One element of damage claimed by the Debtor, in addition to recovery of the Stewart bill and offset of the retainage, is damages of PECO for "wasted" payments from November, 1987, to the time of trial in May, 1989, at the rate of $750 per month, or $14,250.

24. The largest element of damage claimed by the Debtor arises from its loss of Bell Telephone Co. (hereinafter "Bell") as a tenant, which it attributes to the Defendant's actions. Bell had occupied the sixth floor of the Building through November, 1986. At that time, Bell entered into a lease agreement whereby it would move to the third floor of the Building for a five (5) year period beginning November, 1986. However, due largely to the inability of the Debtor to complete the work on the electrical system, the third floor was not ready by November, 1986. On July 17, 1987, Bell wrote and advised Plaintiff that, unless all work was completed on the third floor by August 17, 1987, Bell would consider the lease terminated. When the work was not completed, Bell vacated the sixth floor of the Building in September, 1987, and located elsewhere.

25. The Debtor contends that, had the Defendant returned to the job in early October, 1987, as Banks had requested, the Debtor would have been in a position to give Bell a specific occupancy date, and, given Bell's alleged willingness to wait for the third floor space, that it is "more likely than not" that Bell would have waited an additional month had plaintiff been in a position to complete the work in November, 1987. Therefore, it contends that the Defendant's actions caused it to lose Bell as a tenant, which resulted in a total rental loss of $158,100.00.

26. Robert J. Bennett (hereinafter "Bennett") of Bell's real estate department, was called as a witness by the Debtor. However, Bennett's testimony failed to establish that, as of summer, 1987, Bell desired to remain at the Building. Rather, we find that Bell was quite satisfied to have a basis for extricating itself from the new lease when the Debtor failed to complete the renovations to the third floor by August 17, 1987. Moreover, we find that it was unlikely to have reconsidered this decision in October, especially after it had already vacated the Building in September, 1987.

27. The final element of damages claimed by the Debtor relates solely to Agreement II. The Debtor contends that, despite the statement on the drawings that the partitions were to be removed, the Defendant knew that some portions of the floors from third to the twelfth story were in fact occupied; did in fact have rooms and walls; that the drawings did not represent the current condition of the Building nor the final condition in which the floors were to be built; and that the parties' intention was that sufficient smoke detectors were to be supplied to equip the Building with these floors partitioned.

28. The "latest Philadelphia city Code," the Philadelphia High Rise Fire Code (hereinafter "the Code"), requires that a single stair building which does not have a sprinkler system, such as the Building, must have a smoke detector in each room on each floor. The Defendant did not provide smoke detectors for each room of each floor that was occupied and therefore did not provide enough smoke detectors to meet current Philadelphia Code requirements to equip the Building with these partitions intact. The Debtor subsequently

retained Electronic Methods Associates, Inc. (hereafter "EMI") to provide about two hundred (200) additional smoke detectors necessary to meet code requirements for the Building as partitioned at an expense of $33,000, and it claims that the Defendant is liable to it for this sum.

29. We find, however, that the Proposal attached to the second Agreement contemplated only supplying smoke detectors required under plans consistent with the drawings. Any ambiguity should have been eliminated by the specific statement on the Proposal that only *28* smoke detectors were contemplated and that the price for the number ultimately installed would have required a bid of almost double the amount quoted. There is no evidence that, irrespective of what the Defendant knew about the Debtor's future plans to renovate the Building, it had any knowledge of how the top ten floors would be re-partitioned after the renovations or that, as was apparently the case,[1] the Debtor desired to have smoke detectors supplied as would be necessary if the present partitioning were retained. Hence, the Defendant did not know, nor was it reasonable for it to assume, that the Debtor contemplated its supplying sufficient smoke detectors to comply with the Code when renovations to the upper floors were completed.

## B. CONCLUSIONS OF LAW/DISCUSSION

### 1. *This Court Has Jurisdiction To Hear And Determine This Matter.*

The instant matter is an adversarial proceeding which takes the form of a relatively complex affirmative action instituted by a debtor arising out of pre-petition events. As such, it is clearly related to the Debtor's bankruptcy case and hence jurisdiction for it to be heard in the bankruptcy court is within the scope of 28 U.S.C. § 1334(b).

The Defendant has filed a Proof of Claim in the Debtor's bankruptcy case (No. 18, in the amount of $59,148.08).[2] The Complaint therefore takes the form of a counterclaim to a proof of claim, which is classifiable as a core proceeding which we can determine under 28 U.S.C. §§ 157(b)(1) and (b)(2)(C). Moreover, any question as to whether we were empowered to determine as well as hear it was eliminated by both counsel's express agreement at the beginning of the trial that we could determine it. *See* 28 U.S.C. § 157(c)(2); and *In re Frymire*, 96 B.R. 525, 528 & n. 2 (Bankr.E.D.Pa.1989), *motion to withdraw reference denied*, Misc. No. 89–61 (E.D.Pa. Feb. 14, 1989). We shall therefore determine it.

### 2. *The Defendant Did Not Breach Agreement II.*

We found, as a matter of fact (Finding of Fact 29, page 861 *supra* ), that Agreement II did not require the Defendant to supply more than the twenty-eight (28) smoke detectors required under the drawings indicating that demolition of the partitions on the third through the twelfth floor of the Building was contemplated. The Debtor's claim is based entirely on the premise that the Defendant's reference to compliance with the Code in the Proposal accompanying Agreement II required it to install the number of smoke detectors which were required to comply with the Code after the upper floors were partitioned. Our refusal to make this finding eliminates this claim.

### 3. *The Defendant Did Breach Agreement I By Refusing To Finish The Job Within A Reasonable Time Of Being Requested To Do So By The Debtor.*

None of the Agreements of September 8, 1986, between the parties included any time-limits as for completion of the work. However, both parties assumed that the Defendant was to perform its services as soon as possible. Neither party contemplated that the job would be halted prior to its completion in April, 1987, by the Debt-

---

1. It is unclear to us how EMI could perform this function, since the renovations are clearly not completed. Apparently, no demolition has taken place and the smoke detectors were installed by EMI on the basis of the current partitioning.

2. No mention was made of this claim during the trial and we therefore have no idea how this figure was computed.

or's inability to make satisfactory financial arrangements with PECO.

The Defendant argues that the Debtor's inability to get PECO to make its connection, at the time that the Defendant was prepared to immediately thereafter proceed to complete the job, constituted a breach of the contract which rendered the Defendant's performance impossible. We are well aware of the principle that a promisor is excused from performance which the promisee renders it impossible to perform. *See Frymire, supra,* 96 B.R. at 540–41, and cases cited therein. However, we believe that the Debtor's difficulties with PECO, while rendering the Defendant's completion of performance impossible in April, 1987, did not render the Defendant' performance impossible perpetually, and therefore does not excuse the Defendant from *ever* performing the remainder of the contract. Rather, the supervening fact of PECO's temporary refusal to energize the system merely excused the Defendant's performance for the time in which it was reasonable for it to have been able to return to the job after being appropriately requested to do so by the Debtor.

We reject the Defendant's contention that it was never asked to return to the job. The letter of October 2, 1987, from Banks to Ridlon was clearly a request the Defendant to return to the job. The response of Ridlon, by his letter of October 9, 1987, was not that he was unable to do so because of intervening commitments, but that he was unwilling to do so unless the retainage were paid into escrow with his counsel. This request constituted addition of a condition to the parties' Agreements upon which the Defendant had no right to insist. Furthermore, the filing of the Complaint in this proceeding in November, 1988, was unequivocal notice to the Defendant that the Debtor desired the installation of the three-phase system to be completed by the Defendant forthwith. The response of the Defendant was not to return unless its conditions were met, even as of the date of trial.

We therefore conclude that the Defendant did breach Agreement I. The only remaining issue is whether the Plaintiff proved any damages as a consequence.

4. *The Defendant Wrongfully Removed The Fuses And Keys Which It Had Previously Installed In The Building.*

■ The Defendant's removal of the fuses and keys which it had previously installed in the Building was a clearly wrongful act. Ridlon's attempts to justify this action as a safety measure and/or a measure which it had some right to undertake as an unpaid judgment creditor were totally unconvincing. Once installed in the Building, we believe that the parties intended that the fuses and keys became fixtures which could not properly be separated from it. *See In re Ginsburg,* 255 F.2d 358, 361–64 (3d Cir.1958); *United States v. 15.3 Acres of Land,* 154 F.Supp. 770, 780–81 (M.D.Pa. 1957); and *Rogers v. Gilinger,* 30 Pa. 185, 188–89 (1858). The surreptitious nature of the action and the failure of the Defendant to give the Debtor any advance warning of this action belie any purported claim that this action was a safety measure. Far more convincing was Ridlon's ultimate concession that he had the fuses and keys removed "to get the Debtor's attention" and to have the Debtor contact it, probably to further press its unjustified request that its retainage be paid into escrow before it would return to the job. This action was, therefore, in effect, an attempt to effect an impermissible self-help creditors' remedy.

■ Oppressive, self-help remedies inflicted upon others by parties to a dispute cannot be tolerated by courts of law. *Cf. In re B. Cohen & Sons Caterers, Inc.,* 97 B.R. 808, 814–16 (Bankr.E.D.Pa.1989); *In re Aponte,* 82 B.R. 738, 742–47 (Bankr.E.D. Pa.1988); and *In re Adams,* 65 B.R. 646, 649–50 (Bankr.E.D.Pa.1986). Such actions usually, as here, serve to inflame disputes, which courts, as agents of conflict-resolution, seek to counteract. Therefore, we conclude that the Defendant's removal of the fuses and keys was a significant wrongful act and that the Defendant is liable to the Debtor for the full consequences of this action.

5. *The Defendant Is Liable For Only Those Damages Which Were Reasonably Foreseeable And Proximately Caused By Its Breach Of Agreement I And Its Wrongful Conduct, Although Such Damages Need Not Be Proven With Precision.*

 The damages recoverable by a plaintiff in a contract action must have been reasonably foreseeable to the party guilty of breach, *see In re Repco Products Corp., Repco Products Corp. v. Reliance Electric Co.*, Bankr., 100 B.R. 184, 198–201 (Bankr.E.D.Pa.1989), and must have been proximately caused by the actions of the breaching party. *See In re Direct Satellite Communications, Inc.*, 96 B.R. 507, 515–16 (Bankr.E.D.Pa.1989). "Proximate cause" requires, moreover, that the defendant's conduct be a "substantial factor" in bringing about the harm which results, not simply be just "a" factor or have a "but for" causative relationship with the consequent damages claimed. *Id.* at 516.

 Once foreseeability and proximate cause are established, the plaintiff has the burden of establishing damages by proper evidence. *See Repco Products, supra*, 100 B.R. at 199; *In re Windsor Communications Group, Inc.*, 80 B.R. 712, 717 (Bankr. E.D.Pa.1987), *aff'd in part and rev'd in part*, 96 B.R. 495 (E.D.Pa.1989); and *In re Chapman*, 77 B.R. 1, 6 (Bankr.E.D.Pa. 1987). On the other hand, the plaintiff must only prove damages with "reasonable certainty," and the court may itself compute the damages which are to be appropriately awarded to the plaintiff when the fact of damage is established. *See Story Parchment Co. v. Paterson Parchment–Paper Co.*, 282 U.S. 555, 561, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *Windsor Communications, supra*, 80 B.R. at 727; and *Chapman, supra*, 77 B.R. at 6.

6. *The Debtor Has Failed To Establish That The Defendant's Conduct Was The Proximate Case Of Its Loss Of Bell As A Tenant.*

 In Finding of Fact 25, page 860 *supra*, we found that, contrary to the Debtor's contentions, Bell unequivocally decided, as of August, 1987, to extricate itself from the lease negotiated with the Debtor for the third floor space in November, 1986. Indeed, Bell had left the Building, obviously with few regrets, by September, 1987. Even had the Defendant heeded the demand to return to the job immediately communicated by Banks' letter of October 2, 1987, we find that, by that time, Bell had irrevocably decided to leave the Building. Moreover, the connection by PECO was not actually made until October 27, 1987. We consider it not only speculative, but extremely wishful thinking on the part of the Debtor, to suggest that Bell would have agreed to return to the Building under any conditions once it had a basis for leaving and had in fact left. Bennett's testimony indicated that the renovations to the Building were simply not shaping up as the Debtor and Bell envisioned in November, 1986, and that Bell desired greatly to avoid its lease commitment if it could do so. Since it could, it did.

Although loss of tenants due to its delays in its performance may well have been foreseeable consequences of the Defendant's refusal to return to complete its work in a reasonable time, the only tenant for whose loss the Debtor sought compensation was Bell. The Debtor failed to convince us that the Defendant's breach was responsible for Bell's departure. We shall therefore deny any damages to the Debtor on this basis.

7. *The Defendant Is Clearly And Unconditionally Liable For The Removal Of The Fuses And Keys And The Other Charges Totalling $4,968 Charged By Stewart By The Debtor.*

 The replacement of the fuses and keys by Stewart was a foreseeable consequence of the Defendant's wrongful act of removing same. The Defendant's conduct was clearly the proximate cause of such damages. The other charges imposed by Stewart for energizing the three-phase system were similarly proximately caused by, and clearly foreseeable as a result of, the Defendant's failure to perform these services as required by the Agreement I.

The Defendant's dispute with allowance of this rather modest element of damages is that it is "vague and speculative" and supported only by Stewart's bill which, although duly admitted into evidence by this court over the Defendant's objection, is again attacked as inadmissible hearsay. The Defendant further maintains that admission of the bill nevertheless fails to satisfy the alleged prerequisite to allow these damages that the amounts included thereon are a reasonable measure of the value of the services performed.

■ We note, however, that, in addition to producing Stewart's bill, Banks testified that he received the bill for these services without dispute and intended to pay the amount recited thereon for these services.[3] We believe that a bill is admissible evidence to support a claim for damages, when accompanied by the testimony of a witness for the plaintiff that the costs which it represents were in fact incurred by the Plaintiff. Many authorities concur. *See Penfield v. Venuti*, 589 F.Supp. 250, 258 (D.Conn.1984) (evidence of medical bills and lost earnings permitted to prove damages); *David H. v. Spring Branch Independent School Dist.*, 569 F.Supp. 1324, 1339–40 (S.D.Tex.1983) (checks showing costs of obtaining private education for learning disabled child were admissible to prove this element of damages); *Yost v. City of Philadelphia*, 174 Pa.Super. 555, 560–61, 102 A.2d 210, 212 (1954) (testimony by injured party of expenses for medical bills and homemaker services allowed to support her damage claim); and *Knoble v. Ritter*, 145 Pa.Super. 149, 156–57, 20 A.2d 848, 851–52 (1941) (receipts for the treatment of a co-plaintiff at a sanitarium after an injury were admissible evidence on the damage issue).

■ We therefore have a "reasonable certainty" that $4,968 is an accurate measure of this particular element of damages caused to the Debtor by the Defendant's breach of Agreement I, particularly since the Defendant has not suggested that the bill was in fact excessive. We shall therefore award the Debtor damages in this amount against the Defendant (and ultimately USFG as well).

8. *The Debtor's Claim For Unnecessary Electric–Service Charges Is Doubtful, But Should Be Allowed If The Defendant Persists In Refusing To Complete The Contract.*

The most difficult to assess of the element of damages sought by the Debtor to assess is its claim for the costs of paying PECO for services arising from a three-phase system that is not totally installed and hence is unusable.

We are not troubled by the absence of electric bills to establish the precise amount of this claim. We feel that the measurement of this claim, as asserted, has been established with sufficient "reasonable certainty" by Banks' credible testimony regarding the amounts of the Debtor's electric bills. However, the Debtor's failure to produce more than one bill causes us to be skeptical of the precise figures involved, and therefore we will make a downward adjustment of the excess monthly expenses to $700. This would reduce the potential damage figure for this element to $13,300.

However, the elements of foreseeability and proximate cause relative to this claim for damages trouble us. Damages should logically be sums which the plaintiff has lost or been unable to realize because the defendant has failed to perform contractual undertakings. Had the Defendant here fully installed the three-phase system, the Debtor would have had to pay as great or perhaps a greater electric bill than the entire $1,000 monthly bills which it is in fact paying. The Debtor has therefore not been obliged to make extra payments to PECO as a result of the Defendant's breach of its contract to complete the installation of the three-phase system. What it has lost is the full use of the three-phase system for which it has to pay in any event. Logically, the losses suffered by the Debtor are

---

**3.** Stewart has, however, filed a proof of claim (no. 3) in the amount of $4,968, which suggests

that it was never in fact paid therefor.

the benefits of the three-phase system, not the obligation to pay higher bills. Examples of losses from the failure to receive the benefits of the three-phase system might be losses of tenants or a failure to sell or otherwise realize anticipated profits from the Building if it in fact had an operable three-phase system. Unfortunately, the only evidence of this nature presented concerned Bell, and that claim failed due to other deficiencies.

On the other hand, we understand the Debtor's contention that it has suffered a monetary loss by being required to pay for what it does not have. Certainly, the Defendant could have foreseen the fact that the Debtor would not be able to make use of the three-phase system as a result of its refusal to complete the job. The fact that the system did not operate is clearly the proximate cause of the Debtor's inability to receive the three-phase service for which it is paying PECO.[4]

Our ultimate decision is to allow the Defendant a commutation of damages in the form of a recovery of the retainage if it completes the work due under the Agreement I in timely fashion. We will also render the payment of this $13,300 figure conditional, subject to commutation on the condition that the Defendant promptly complete the services pursuant to its contractual undertaking as an added incentive to the Defendant to perform these services. *Compare In re Adams*, 94 B.R. 838, 853–54 (Bankr.E.D.Pa.1989); and *In re Boston Business Machines*, 87 B.R. 867, 873–74 (Bankr.E.D.Pa.1988). Particularly in a core proceeding under 28 U.S.C. § 157(b)(2)(C), which is an equitable proceeding, *see In re Direct Satellite Communications, Inc.*, 91 B.R. 7, 8 (Bankr.E. D.Pa.1988), such "conditional verdicts" are not impermissible. *See Zintsmaster v. Werner*, 41 F.2d 634, 635 (3d Cir.1930); *Harner v. Holton*, 25 Pa. 245, 249 (1855); and 20 P.L.E. 250 (1959).

9. *The Defendant Shall Be Entitled To Recover Its Retainage And To Avoid $13,300 Of The Damages Otherwise To Be Awarded Against It If It Returns To The Building And Completes The Job Within Thirty (30) Days.*

The tragedy of the facts underlying this proceeding, from the standpoint of the Debtor, is that it cannot complete the conversion of the Building's electric service to the highly-desirable three-phase system for an indefinite period because of the Defendant's breach of the contract and the Debtor's apparent financial inability to hire a replacement contractor. The Defendant is clearly not entitled to its retainage unless it completes the contract. However, as Ridlon may have foreseen when he demanded the escrow deposit as an impermissible condition to complete the job in October, 1987, a right to the retainage translates into only a proof of claim in this bankruptcy case, the value of which is questionable.

The addition of a conditional liability of $13,300, as well as the loss of its right to collect the retainage, both of which can be commuted, may place matters in a different perspective for the Defendant. We do hold, however, that the $4,968 damages for the Defendant's effective sabotage of its own work shall not be subject to commutation.

We note that USFC is liable on its Performance Bond for all sums awarded to the Debtor against the Defendant here, as they all arise from Agreement I. We will therefore order that judgment be entered in favor of the Debtors against both Defendants in the amount of $18,268.00. However, if the Defendant satisfies its contractual obligations under Agreement I and puts in the three or four days of work necessary to complete the job within the next thirty (30) days, then the Defendant will be adjudged entitled to its retainage and both of the Defendants shall be liable to the Debtor in the amount of only $4,968.00. This latter sum is not made

---

**4.** We also suspect that the non-functioning of the three-phase system would have adversely impacted the Debtor's ability to pass these costs through to its remaining tenants. However, the Debtor failed to present any evidence of, or argument in support of, this factor.

conditional because the Debtor obligated itself to pay this amount to another party as a direct consequence of the Defendant's contractual breach and other wrongful conduct. We shall also not allow the Defendant to set off the $4,968 award against its retainage due to our conclusion that the Defendant's conduct in removing the fuses and keys and refusing to complete its obligations under Agreement I was intentionally wrongful. *See In re Windsor Communications Group, Inc.,* 79 B.R. 210, 217 (E.D.Pa.1987).

An appropriate Order, consistent with these conclusions, will be entered.