In re ST. MARY HOSPITAL, Debtor.

William BONNER, M.D. and Gabriel Rosales, M.D., Plaintiffs,

v.

Roger B. HISER, Trustee Defendant.

Bankruptcy No. 88–11421S.
Adv. No. 88–2157S.

United States Bankruptcy Court,
E.D. Pennsylvania.

June 26, 1989.

---

David Fishbone, Patrick J. Casey, Ciardi, Fishbone & DiDonato, Philadelphia, Pa., for trustee.

Gary Schildhorn, Philadelphia, Pa., for Creditors' Committee.

Henry F. Siedzikowski, Philadelphia, Pa., for debtor.

Roger B. Hiser, East Greenville, Pa., trustee.

Joseph M. Gontram, McBride, Ruch, & Gontram, Philadelphia, Pa., for plaintiffs.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa., U.S. Trustee.

OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

A. INTRODUCTION

This adversary proceeding presents two interesting issues of contract law: (1) The impact of the acceptance of an anticipatory breach of a contract by a repudiatee upon its damage claim against the repudiator; and (2) Whether a court should interpret a

contract as it is written or as the parties understand it and have apparently interpreted it in the past. With respect to the first issue, we conclude that the acceptance of the repudiation eliminates the right of the repudiator to retract the breach, but that, where the repudiatee engages in a course of conduct evincing a clear unwillingness not to perform, it waives a right to damages for the breach. With respect to the second issue, we hold that the contract terms, being unambiguous, must be interpreted as written.

Applying the first holding to the facts of this proceeding causes us to decline to allow either party any damages for the alleged breach of the contract against the other. Applying the second holding results in our concluding that the defendant Trustee is entitled to recover, after allowance of a setoff of a pre-petition debt owed to the Plaintiffs by the Debtor, a net sum of $15,351.50 on his counterclaim.

B. PROCEDURAL HISTORY

This is the fourth and perhaps last written Opinion in the saga of a sick hospital to which the Plaintiff-doctors refused to administer but which, due to life-saving actions of other doctors and many interested laymen, appears to have survived. On April 27, 1988, the Debtor, ST. MARY HOSPITAL, voluntarily filed the bankruptcy case underlying this proceeding under Chapter 11 of the Bankruptcy Code. The rather extraordinary history of the case is set out in two of our prior Opinions, reported at 86 B.R. 393, 395–97 (Bankr.E.D.Pa. 1988) (hereinafter *"Opinion I "*); and 97 B.R. 199, 200–02 (Bankr.E.D.Pa.1989) (hereinafter *"Opinion III"* ).[1] We should add that, on April 5, 1989, after the filing of Opinion III, we proceeded to confirm a Plan of Reorganization submitted jointly by the Trustee and Franciscan Health Services, Inc. (hereinafter "FHS").

Without reiterating what is said in those Opinions, it is important to state that, while the Debtor and FHS initially resolved to close the Debtor's hospital, swift and per-

1. The other Opinion, reported at 89 B.R. 503 (Bankr.E.D.Pa.1988) (hereinafter *"Opinion II"* ), includes very little history of the case.

suasive proceedings and motions prepared by four doctors working out of the hospital and several community persons and groups and elected officials, represented by vigorous and competent counsel, convinced us to appoint first an examiner and then Defendant ROGER B. HISER as Trustee (hereinafter "the Trustee"), who took a different course. The Trustee kept the hospital open for several months and then ultimately sold the hospital to a corporation apparently committed to preserving it, making this case a rather dramatic "bankruptcy success story."

On October 21, 1988, WILLIAM BONNER, M.D. and GABRIEL ROSALES, M.D. (herein "the Plaintiffs"), commenced this proceeding by filing an adversary Complaint in this court. We note that on March 15, 1989, the Plaintiffs also filed a proof of claim in the main bankruptcy case (No. 481), in the amount of $138,743.00. In the Complaint, the Plaintiffs requested us to compel the Defendant–Trustee, to account for, impress a trust upon, and pay over to them, funds which the Trustee had purportedly collected on behalf of the Plaintiffs' Industrial Health Center (hereinafter "the IHC"), a clinic operated in the Debtor's facility. The Trustee filed not only an Answer to the Plaintiffs' Complaint on November 23, 1988, but also included therein a two-count Counterclaim, seeking damages for the Plaintiffs' alleged breach of contract and recovery of overpayments under the contract during its operation and duration.

On December 2, 1988, the Plaintiffs answered the Counterclaim, admitting the averments therein that the Counterclaim was not only within our jurisdiction to hear, but was core in nature, which would allow us to determine it. On January 13, 1989, they filed a motion asking our permission to file an Amended Complaint to set forth a claim for damages arising from the Debtor's alleged breach of the parties' contract. Upon the Debtor's opposition thereto, we denied this motion in an Order of February 24, 1989, on the ground that the Plaintiffs were simply seeking to present a monetary claim against the Debtor, which should be properly relegated to the claims process. *See, e.g., In re Clark,* 91 B.R. 324, 338 (Bankr.E.D.Pa.1988); and *In re New York City Shoes,* 84 B.R. 947, 960 (Bankr.E.D. Pa.1988).[2]

Pursuant to the scheduling set forth in the Pre-trial Order aspect of the Order of February 24, 1989, the hearing was held before this court on April 26, 1989, and May 1, 1989. At the conclusion of the trial, the Plaintiffs and the Debtor, neither of which desired to order a transcript, were instructed to file proposed Findings of Fact and Conclusions of Law and Briefs on or before May 31, 1989, and on or before June 15, 1989, respectively.

On June 9, 1989, despite their statements in the pleadings, a Pre-trial Stipulation of Facts, and their own recently-submitted Findings of Fact that this entire proceeding was subject to our jurisdiction and was a core proceeding, the Plaintiffs moved to dismiss the Trustee's counterclaim for lack of jurisdiction on the ground that it was non-core, citing *In re M.S.V., Inc.,* 97 B.R. 721 (D.Mass.1989). On June 13, 1989, we summarily denied this motion, noting that the Plaintiffs had misread *M.S.V.* as stating that a bankruptcy court lacked jurisdiction and must dismiss a non-core proceeding and pointing out that, not only did this proceeding appear to be core pursuant to 28 U.S.C. § 157(b)(2)(C), but also the Plaintiffs' previous statement that the matter was core constituted consent to hear it. *See* 28 U.S.C. § 157(c)(2); Bankruptcy Rule (hereinafter "B.Rule") 7012(b); and *In re Frymire,* 96 B.R. 525, 528 n. 2 (Bankr.E.D. Pa.1989), *motion to withdraw reference denied,* Misc. No. 89–61 (E.D.Pa. Feb. 14, 1989) (belated attempt to withdraw express consent of bankruptcy court to hear a potentially non-core matter is ineffectual).

Since this proceeding involved protracted and disputed testimony, we are obliged to prepare our decision, pursuant to B.Rule

---

**2.** In retrospect, the same might have been said about the claims set forth in the original Complaints. *See* pages 457–58 *infra.*

7052 and Federal Rule of Civil Procedure 52(a), in the form of Findings of Fact and Conclusions of Law. Our Conclusions of Law appear as headnotes to subsequent discussions of each legal issue.

## C. FINDINGS OF FACT

1. On July 3, 1986, the Debtor and the Plaintiffs entered into an Industrial Health Center Agreement (hereinafter "the Contract") by the terms of which the Plaintiffs were to operate the IHC in the Debtor's hospital for a period of five (5) years.

2. The terms of the Contract included, *inter alia*, the following:

HOSPITAL, at its expense, shall provide such equipment and supplies as may be necessary for the proper operation and conduct of the INDUSTRIAL HEALTH CENTER; shall keep and maintain such equipment in good order and repair, replacing same when obsolete with equipment of similar character and utility; shall furnish the necessary janitorial and messenger service, laundry and utilities; and shall furnish adequate film viewing and reporting areas.

HOSPITAL shall furnish appropriate nonmedical and paramedical personnel as required for the efficient operation of the CENTER. Such personnel shall be hired, employed, discharged and paid by HOSPITAL in cooperation with PHYSICIANS. However, supervision of such personnel in the execution of their duties, shall be the sole responsibility of PHYSICIANS.

. . . . .

HOSPITAL agrees to reimburse PHYSICIANS each or the sum of all collections of $40.00 a hour, whichever is greater, for the first six months of operations of the INDUSTRIAL HEALTH CENTER for an eight-hour workday, or $320.00 per day minimum.

After six months, PHYSICIANS will be paid on all collections only. PHYSICIANS account will be credited if an account cannot be collected....

The last paragraph quoted above unambiguously states that the Plaintiffs will be paid on the basis of collections, not billing.

The contract also provided that either party could terminate the contract during the five-year period only upon 180 days written notice to the other, and the Plaintiffs agreed that, during the five-year term, they would not operate a similar clinic within a three-mile radius of the Debtor.

3. The IHC was to be a specialized facility, within the hospital, for the treatment of work-related injuries. Each of the Plaintiffs spent about half of his professional time at the IHC, maintaining a private office elsewhere simultaneously. All of the employees working in the IHC, except the Plaintiffs, were employees of the Debtor and were compensated by it.

4. The IHC was increasingly profitable over the course of its existence in the Debtor's hospital, and was of significant financial benefit to the Debtor, as it generated additional patients for other hospital departments. The IHC clearly was a valuable asset to the Debtor, and any party who wished to continue the operation of the hospital, such as the Trustee, would have logically attempted to retain the IHC on the Debtor's premises to the contract.

5. All parties were please with the contractual relationship and they enjoyed a mutually-beneficial and harmonious symbiotic relationship until April 27, 1988.

6. On April 27, 1988, Edmond L. Plummer, Jr., the President of the Debtor, sent a letter to the Plaintiff Rosales, which stated, in pertinent part, that the hospital would close and "all hospital services will end during the next month."

7. The Plaintiffs had received no prior notice that the Debtor would close the hospital. Although taken aback, on April 28, 1988, the Plaintiffs sent a letter to Mr. Plummer which stated, in complete text, as follows:

Because of the current situation here at St. Mary Hospital, Dr. Rosales and I feel that your facility, along with the Franciscan Health System, has breached our contract. We are hereby formally notifying you that Dr. Rosales and I will be moving our Industrial facility before July 1, 1988.

8. On April 29, 1988, the Plaintiffs were notified by representatives of the Debtor that the Debtor's Emergency Room would close that night. Maintenance of the Emergency Room was vital to the functioning of the IHC.

9. Later that same day of April 29, 1988, by Order of this court, the closing of the Emergency Room was and the Debtor's Operational plan to close the hospital were enjoined. *See Opinion I,* 86 B.R. at 395–96. After an examiner was appointed on May 4, 1988, our Opinion of May 9, 1988, was issued, further enjoining the closure of the Emergency Room and diminution of the Debtor's hospital services. *See id.* at 395–97, 403–04. After receiving the examiner's report on May 13, 1988, we indicated our intention to appoint a trustee to maintain the hospital as a going concern, which resulted in the appointment of the Trustee on May 17, 1988. *See Opinion II,* 89 B.R. at 504 n. 1. Consequently, the course of the foregoing proceeding, which received considerable news media publicity, countermanded the efforts of Debtor and FHS to close the hospital at all times on and after April 29, 1988.

10. The Plaintiffs did not receive any money from the Debtor for their pre-petition billings or collections in March and April, 1988, although the billings totaled $20,914.50, due to the intervention of the bankruptcy case.

11. In late April or early May, 1988, Vincent McCorkle, an employee of the FHS, then in charge of the hospital, allegedly gave the Plaintiffs permission to bill patients directly and collect what had been the hospital's share of the billings, estimated at forty (40%) percent of the total billings up to that point, as well as the Plaintiffs' own share of billings.

12. On May 24, 1988, the Trustee met with the Plaintiffs for the first time. Although the Plaintiffs indicated that they considered the delay in the Trustee's meeting with them inordinate, we credit the Trustee's testimony that, given the confusion at the hospital, this was the earliest date on which he could possibly have met with the Plaintiffs. During that meeting, the Trustee attempted to persuade the Plaintiffs to continue to maintain the IHC in the Debtor's hospital.

13. In response to the Plaintiffs' indications to him that they needed immediate payments to continue, the Trustee paid the Plaintiffs $6,000 as payment for reimbursements believed to be owed to the Plaintiffs for pre-petition services and as an inducement for the Plaintiffs to continue to maintain the profitable IHC on the Debtor's premises. The Trustee also assured the Plaintiffs that other services and supplies would continue to the facility and put Plaintiff Bonner in charge of maintaining the hospital's physical therapy unit.

14. Nevertheless, on May 27, 1988, the Plaintiffs wrote to the Trustee indicating that they intended to take the IHC out of the hospital as of June 7, 1988, because it was believed that the hospital's employees servicing the IHC would resign on or about that date. A mutual release and agreement was enclosed with the letter, but apparently never executed.

15. On June 7, 1988, the Plaintiffs again wrote to the Trustee, stating that because he could not guarantee their future existence in the hospital, they would be moving from the hospital within two weeks' time. None of the correspondence from the Plaintiffs indicated any intention to claim that the Debtor was liable for damages for breach of the contract.

16. The trustee continued to attempt to negotiate a settlement by which the Plaintiffs would remain in the hospital, utilizing Vincent Papaccio, a Vice–President whom he had retained, as the hospital's principal negotiating agent.

17. Nevertheless, on June 17, 1988, the Plaintiffs irrevocably terminated their operation of the IHC on the Debtor's premises, and relocated the IHC at Episcopal Hospital, which is located approximately 1.2 miles from the Debtor. After their departure, the Plaintiffs hired many of the former employees of the Debtor who had worked with them at the IHC, including Mr. Papaccio as their administrator.

18. Despite the Plaintiffs' claims to the contrary, services and supplies provided by the Debtor to the IHC continued in sufficient amounts through June 17, 1988, and continued thereafter in sufficient amounts, to have met the terms of the contract.

19. When the Plaintiffs relocated, they also took with them many important records and files that properly are the property of the Debtor. As early as April 29, 1988, the Plaintiffs had been notifying their patients that the Debtor would no longer be able to meet their needs, and advised many of them to go to Episcopal Hospital where the Plaintiffs were negotiating a new contract for the operation of their IHC.

20. The Debtor contracted with Leonard M. Popowich, M.D., to continue to operate an IHC on the Debtor's premises, but this IHC was far less profitable than the IHC that had been in operation by the Plaintiffs.

21. From January, 1987, through February, 1988, the last month for which regular payments were made, the Debtor had paid the Plaintiffs on the basis of billings, not collections, as called for by terms of the Contract.

22. An employee of the Debtor's accountant, Bruce A. Dahlberg, C.P.A., testified credibly, supported with profuse though largely inscruable statistical data, that the collections of the IHC were 14.7 percent less than its billings and that, as of January 31, 1989, he estimated that the Plaintiffs had been overpaid a total sum of $33,193.00.[3] James D. Gazonas, C.P.A., hired by the Plaintiffs, while hypothecizing a different and less convincing interpretation of Mr. Dahlberg's figures, did not dispute their accuracy.

23. Assuming that 14.7 percent of the bilings were not collected, the Plaintiffs could have expected to receive 85.3 percent of their unpaid March and April billings of $20,915, see Finding of Fact 10, page 456 supra, or $17,841.50, for unpaid pre-petition services.

24. The Plaintiffs, pursuant to Mr. McCorkle's alleged instructions, collected $22,000 to $24,000 from post-petition billings of the entire bills of IHC patients.[4]

25. In its Plan of Reorganization, confirmed on April 5, 1989, the Debtor provided that it rejected all executory contracts not expressly assumed. The Contract in issue was not expressly assumed.

D. CONCLUSIONS OF LAW

1. THIS COURT HAS JURISDICTION TO HEAR AND DETERMINE THIS MATTER.

The instant adversary proceeding arises in and relates to the Chapter 11 case of the Debtor. This court thus has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). Contrary to the Plaintiffs' attempt to repudiate their earlier concession that this proceeding is not only related to the Debtor's bankruptcy case, but is a core proceeding,[5] we hold that this is a core proceeding.

The Plaintiffs' initial Complaint is, in substance, a claim against the Debtor's estate. Given this observation, we could have and probably should have, relegated the entire main claim to the claims process. See page 454 & n. 2 supra. Having failed to do so, we are obliged to nevertheless categorize the main claim as litigation concerning allowance or disallowance of a claim against the Debtor and hence core under 28 U.S.C. § 157(b)(2)(B). See In re

---

**3.** As we read Mr. Dahlberg's calculations, the $6,000 payment made to the Plaintiffs by the Trustee in late May, 1988, has already been factored in to this figure.

**4.** It appears that the Plaintiffs thus received additional funds to which they were not entitled pursuant to the procedure allegedly authorized by Mr. McCorkle. However, the Trustee has made no claim for this sum, either in his Complaint or in his post-trial submissions.

The rather distasteful facts suggesting that the Plaintiffs lured employees away from the Debt-

or and negotiated with it, through Mr. Popaccio, whom they ultimately hired, in bad faith, are also not recited as basis of any causes of action in the Debtor's Complaint or post-trial submissions. We therefore cannot and will not consider such claims as more than a backdrop to claims actually made.

**5.** This attempted repudiation, though already determined by us to be ineffectual, see page 454, supra, seems quite in place in a lawsuit involving reputiations and retractions of obligations under a contract.

*Meyertech Corp.*, 831 F.2d 410, 417–18 (3d Cir.1987).

Since we ultimately conclude that liability runs in favor of the Debtor on the counterclaim instead of the Plaintiffs on their claim, the error in failing to relegate this proceeding to the claims process becomes irrelevant. Given the nature of the main claim and in light of the existence of a proof of claim filed by the Plaintiffs, the Debtor's Counterclaim, on which we do enter judgment, is clearly core under 28 U.S.C. § 157(b)(2)(C), which embraces counterclaims by the estate against persons filing proofs of claims.

Therefore, the proceeding is core and we must determine it pursuant to 28 U.S.C. § 157(b)(1). The consent of the Plaintiffs, which they have attempted to revoke, is irrelevant. *But see* 28 U.S.C. § 157(c)(2). We shall therefore determine all aspects of it.

### 2. THE DEBTOR'S LETTER OF APRIL 27, 1988, CONSTITUTED AN ANTICIPATORY BREACH OF THE CONTRACT.

■ The Plaintiffs contend, we hold rightly, that the letter from Mr. Plummer to them on April 27, 1988 (*See* Finding of Fact 6, page 455 *supra* ), constituted an anticipatory breach of the contract. As Judge Fox of this court recently held in *In re Stardust Inn, Inc.*, 70 B.R. 888, 893 (Bankr.E.D.Pa.1987):

> In *In re Silberman*, 30 B.R. 219, 226–27 (Bankr.E.D.Pa.1983), Chief Judge Goldhaber set forth the test for determining whether an anticipatory breach of contract has occurred:
>
> "Under Pennsylvania law, in order for the renunciation of a contract to rise to the level of an anticipatory breach, 'there must be an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so.' *McClelland v. New Amsterdam Casualty Co.*, 322 Pa. 429, 433, 185 A. 198, 200 (1936), quoted in *McCloskey & Co. v. Minweld Steel Co.*, 220 F.2d 101, 104 (3d Cir.1955)."
> *Accord, Restatement (Second) of Contracts* § 250 (1979). . . .

*Accord, e.g., William B. Tanner Co., Inc. v. WIOO, Inc.*, 528 F.2d 262, 268–71 (3d Cir.1975).

We find no evidence of any intentions in the actions of Mr. Plummer not to bind his successor and, as we point out, at pages 458–459 *infra*, we believe that matters had already gone too far as of the date of the Trustee's appointment to allow equitable considerations to intervene and permit the Trustee to disclaim the debtor-in-possession's actions. *See In re American Int'l Airways, Inc.*, 75 B.R. 1023 (Bankr.E.D.Pa.1987); and *In re Philadelphia Athletic Club, Inc.*, 17 B.R. 345, 347 (Bankr.E.D.Pa.1982). The statements in Mr. Plummer's letter were extremely absolute, unequivocal, and positive. The IHC could not continue to exist if the hospital were closed, as the letter stated would transpire. Therefore, we conclude that the Debtor anticipatorily breached the contract.

### 3. THE PLAINTIFFS' INDICATION THAT THEY ACCEPTED THE DEBTOR'S REPUDIATION OF THE CONTRACT RENDERS THE TRUSTEE'S ATTEMPTED RETRACTION OF THE REPUDIATION INEFFECTUAL.

The only real response of the Debtor to the Plaintiffs' assertion that the Contract was anticipatorily breached is a contention that the Trustee, as soon as he came on borad, retracted the repudiation. In fact, it might be contended that a retraction was effected by this court's series of orders, beginning on April 29, 1988, which countermanded the Debtor's original plans to close the emergency room and, ultimately, the entire hospital.

■ However, to be effective, a retraction must be effected "before [the repudiatee] materially changes his position in reliance on the repudiation or indicates to the other party that he considers the repudiation to be final." RESTATEMENT (SECOND) OF CONTRACTS (hereinafter "the Restatement"), § 256(1), at 293 (1981). *See also,* 17 AM.JUR.2d 915–16 (1964); 4 A. CORBIN, CORBIN ON CONTRACTS, § 980, at 930–31 (1951) (hereinafter "Corbin"); and 11 S. WILLISTON, A TREATISE ON THE LAW OF CONTRACTS,

§ 1335, at 182–83 (3d ed. W. Jaeger 1968) (hereinafter "Williston").

The letter of April 28, 1988, from the Plaintiffs to Mr. Plummer in reply to Mr. Plummer's letter (*see* Finding of Fact 7, page 455 *supra*) was an equally absolute, unequivocal, and positive statement that the Plaintiffs considered the Debtor's repudiation to be final and that they would relocate the IHC. This confirmatory letter was dispatched before even the events of April 29, 198, which began the turnaround of the intentions of the Debtor expressed in the April 27, 1988, letter.

■ We further observe that, while the Trustee acted as if he had a clear intention to retract Dr. Plummer's declaration, he never did so in as many words. Therefore, we are compelled to conclude that, as of April 28, 1988, the Contract had been irrevocably terminated, subject only to the power of the parties to the contract to unanimously agree to restore it. We do not find that any of the subsequent negotiations between the parties, despite attempts to do so, ever resulted in the requisite unanimous and definite agreement to restore it.

4. SINCE THE CONTRACT WAS TERMINATED PURSUANT TO ITS OWN REPUDIATION, THE DEBTOR HAS NO CAUSE OF ACTION FOR DAMAGES FOR BREACH OF THE CONTRACT AGAINST THE PLAINTIFFS.

■ It is perhaps too self-evident to require authority to observe that, since the Debtor anticipatorily repudiated the contract, it has no cause of action against the Plaintiffs for breach of the contract. Therefore, its claim for damages because the Plaintiffs breached the 180–day notice

requirements and three-mile non-competition covenant must fail.

This conclusion renders it unnecessary for us to consider whether the Plaintiffs are entitled to damages because of the Debtor's alleged continuing breach of the Contract by failing to provide the IHC with necessary services and supplies. Having accepted the Debtor's anticipatory repudiation in rapid-fire (we might say precipitous) fashion, the Plaintiffs evinced an intention to release both parties from the Contract as completely and as quickly as possible. We expressly found (Finding of Fact 18, page 457 *supra*) that, contrary to the testimony of the Plaintiffs, services and supplies were adequately maintained by the Trustee.[6] In any event, having chosen to leave the Debtor, as it were, high and dry, the Plaintiffs can scarcely complain, with a straight face, about the services they received. The Trustee obviously attempted to cater to them to induce them to stay. Apparently, however, no amount of catering, as we suspect the Plaintiffs knew, was apt to change their irrevocable decision to seek greener pastures.

This conclusion also renders it unnecessary for us to resolve the bankruptcy law issue of the effect of the Debtor's rejection of the Contract. *See* Finding of Fact 25, page 457 *supra.* As the Plaintiffs argue, the rejection of the contract constitutes a breach immediately before the date of the filing of the petition. 11 U.S.C. § 365(g)(1). Assuming *arguendo* that a contract terminated by both parties post-petition remains in the category of an executory contract, there may be a point to the Plaintiffs' argument that the rejection of the contract forecloses any potential contention of the trustee that the Debtor did not breach the Contract.

However, we do not award any damages to the Trustee for breach of the Contract in any event. Moreover, in no sense does the

**6.** We found particularly unworthy of consideration the contentions of Plaintiff Bonner that not only services and supplies but also his own level of compensation were reduced to such a level as to cause significant personal hardship to him. We note that Plaintiff Bonner at all times maintained his presumably profitable private practice. Furthermore, the Plaintiffs were in fact receiving proceeds from billings in excess of that to which they were entitled or had even

received previously pursuant to Mr. McCorkle's alleged instructions that they could retain even the hospital's portion of the bills. *See* Findings of Fact 11 and 24, pages 456, 457 *supra.*

The concern both Plaintiffs expressed with the loss of support personnel rings particularly hollow, in light of the Plaintiffs' subsequent decision to enlist practically all of the staff in their own new operation of the IHC at Episcopal Hospital.

Debtor's breach foreclose it from seeking other damages from the Plaintiffs which are not related to the Plaintiffs' alleged counter-breach. *Cf. In re Summit Airlines, Inc.,* 94 B.R. 367, 373 n. 2 (Bankr.E.D.Pa.1988) (breach of executory contract does not foreclose assertion of rights of party which it has in addition to damages arising from the breach). This observation becomes relevant when we consider the merits of the Debtor's other counterclaim.

5. THE PLAINTIFFS' FAILURE TO ESTABLISH THAT THEY WERE WILLING TO PERFORM THEIR PART OF THE CONTRACT ELIMINATES THEIR CLAIM FOR DAMAGES AGAINST THE DEBTOR FOR ITS BREACH OF THE CONTRACT.

 Ordinarily, the repudiatee of an anticipatory breach of a contract has a right to damages caused to him by the repudiator's breach. *See, e.g.,* Restatement, *supra,* § 253, at 286. However, the repudiatee's right to damages is discharged "if it appears after the breach that there would have been a total failure by the injured party to perform his return promise," *id.,* § 254(1), at 290, because the repudiatee is not able or willing to perform its obligations under the contract. *See United States overseas Airlines, Inc. v. Compania Aerea Viojes Expresos de Venezuela,* 246 F.2d 951, 952 (2d Cir.), *cert. denied,* 355 U.S. 893, 78 S.Ct. 266, 2 L.Ed.2d 191 (1957); *Alabama Football, Inc. v. Greenwood,* 452 F.Supp. 1191, 1194–96 (W.D.Pa. 1978); 17 AM.JUR.2d, *supra,* at 913–14; and 4 Corbin, *supra,* § 978, at 924–25. Put another way, the repudiatee has the burden of mitigating its damages by taking reasonable measures to minimize its losses. *See* 11 Williston, *supra,* §§ 1301, 1302, at 78–79, 83.

██ The conduct of the Plaintiffs here indicates an unabashed unwillingness to continue their operation of the IHC at the Debtor's hospital, irrespective of what the Trustee offered it in the way of incentives to remain. As of April 29, 1988, they were advising their patients to go to Episcopal Hospital, where they intended to move the IHC, *see* Finding of Fact 19, page 457 *supra,* and they apparently never counter-

manded these instructions. Thus, the Trustee's payment of funds to which the Plaintiffs' rights were in any event questionable and his offers to accommodate the Plaintiffs appear to us to have fallen on deaf ears. The Plaintiffs, with the Debtor's own employees and even the party chosen by the Trustee to negotiate with them in tow, appeared, to us, unconditionally unwilling to remain at the Debtor-hospital. Even the psychological pressure of their peers seeking to save the hospital was insufficient to cause the Plaintiffs to relent and remain.

The Plaintiffs' own course of conduct both prior to and at trial supports the conclusion that they never considered themselves entitled to damages for the Debtor's breach of the Contract. Their letters of April 28, 1988; May 27, 1988 (containing, apparently, a release); and June 7, 1988, make no mention of any claims for damages.

Finally, at trial, no damages were proven for this element in even the sketchiest fashion. While our Order of February 24, 1989, denying them the right to amend their complaint to assert such damages may have discouraged the Plaintiffs from litigating this issue in this trial, we did, in that Order, also expressly state that any such claims could be asserted defensively, citing *In re TM Carlton House Partners, Ltd.,* 93 B.R. 859, 870 (Bankr.E.D.Pa.1988). Nevertheless, the Plaintiffs presented no evidence to support such a cause of action. We therefore conclude that they have no basis for such a claim, either offensively or defensively in the way of setoff.

6. THE TRUSTEE IS ENTITLED TO DAMAGES ON HIS COUNTERCLAIM AGAINST THE PLAINTIFFS FOR OVERPAYMENTS BASED ON COMPUTING THE PAYMENTS ON BILLINGS RATER THAN COLLECTIONS.

The Contract provides that the Plaintiffs were to be paid on the basis of "collections only." *See* Finding of Fact 2, page 455 *supra.* Nevertheless, the Plaintiffs were paid on the basis of *billings,* rather than on the basis of *collections.*

The Plaintiffs defend the propriety of the amounts which they received on two grounds. First, they claim that the Contract is ambiguous. As articulated by Plaintiff Rosales at trial, he believed that the sentence allowing the Plaintiffs to be compensated "if an account cannot be collected" meant that the Plaintiffs were to be paid whether collections took place or not, *i.e.*, according to billings.

We note that the Plaintiffs have wisely abandoned this specious contention in their post-trial submissions. Accounts which *cannot* be collected are rather apparently a smaller class of accounts than those billed but not paid. Crediting an account is not necessarily the equivalent of obtaining full payment for amounts billed. If the Contract had meant to have the Plaintiffs paid on billings, it would have used the term "billings," not the terms "collections *only*," even if modified by any further language.

■■■ Whether a contract term is ambiguous or not and what it means is an issue of fact. *See, In re Reading Co.*, 76 B.R. 386, 389 (E.D.Pa.1987). We expressly found the Contract provision in issue unambiguous, and to mean that the Plaintiffs are to be billed on collections, not billings. *See* Findings of Fact 2, page 455 *supra*.

■■■ Secondly, the Plaintiffs claim that, through the Debtor's course of conduct for slightly over a year of computing the amount due to the Plaintiffs on the basis of billings, the parties effectively modified the Contract by changing the term "collections" to "billings." In meeting this argument, we first observe that an unambiguous contract provision must be interpreted as it is written, not as the parties may have meant it or interpreted it. *See, e.g., Pennsylvania R.R. v. Trimble*, 77 U.S. (10 Wall.) 367, 377, 19 L.Ed. 948 (1870); *In re Penn Central Transportation Co.*, 831 F.2d 1221, 1225–28 (3d Cir. 1987); *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1009–14 (3d Cir.1980); *In re Temp–Way Corp.*, 82 B.R. 747, 751 (Bankr.E.D.Pa.1988); 1 Corbin, *supra*, § 104, at 464 (1963); and 4 Williston, *supra*, § 610, at 499–500 (3d ed. Jaeger 1961). Thus, the term "collections" cannot be read to mean "billings," even if both parties so intended it.

■■■ The Plaintiffs are correct in asserting that a written contract can be modified by a subsequent oral agreement. *See In re Franks*, 95 B.R. 346, 352–53 (Bankr.E.D. Pa.1989). However, the oral modification of a material term in a written contract is not accomplished lightly. *Compare id.* At a minimum, the Plaintiffs would be obliged to establish that the parties both intended to and mutually expressed an intention to modify it. No evidence that these terms. were even so much as discussed was advanced by the Plaintiffs. Nor was any consideration given by the Plaintiffs for such a substantial modification set forth. Nor were grounds for finding the elements of reliance and change of position necessary to establish equitable estoppel placed of record. Rather, the Plaintiffs seem to argue that, since the Debtor used billings as a basis for calculating amounts payable in the first year of the contract, the Debtor should be found to have agreed that the proper basis for computation was billings, not collections.

We cannot agree. There is no indication that the Debtor meant the payments based on billings as anything but interim advances pending determination of collections at the end of the Contract. The anticipatory breach of the Contract by the Debtor and its acceptance by the Plaintiffs brought the end of the Contract more quickly than anticipated, and requires that the "settling up" be done now. Moreover, even if the Debtor erroneously thought that billings were the bases for computation, that would not make it so.

We therefore conclude that the Trustee is entitled to recover the excess payments made to the Debtor on the basis of billings rather than collections.

7. THE DEBTOR IS ENTITLED TO DAMAGES OF $33,193.00, LESS A SETOFF OF AN ESTIMATED $17,841.50 IN PRE–PETITION OBLIGATIONS TO THE PLAINTIFS, OR A NET JUDGMENT OF $15,351.50.

■■■ In Finding of Fact 22, page 457 *supra*, we expressed our intention to ac-

cept the figure of $33,193.00 which Mr. Dahlberg stated was the total of overpayments received by the Plaintiffs over the duration of the Contract. While we confess that we cannot follow all of the calculations submitted by Mr. Dahlgren, we observe that neither the Plaintiffs nor Mr. Gazonas gave us any reason to doubt their accuracy. Therefore, we have a "reasonable certainty" that this figure is accurate. *See Story Parchment Co. v. Paterson Parchment–Paper Co.*, 282 U.S. 555, 561, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *In re 222 Liberty Associates, 222 Liberty Associates v. EESCO Electric, Inc.*, 101 B.R. 856, 863, 863–65 (Bankr.E.D.Pa.1989); and *In re Chapman*, 77 B.R. 1, 6 (Bankr. E.D.Pa.1987).

We are prepared to allow the Plaintiffs to set off the Debtor's pre-petition liability to them against this sum. In so doing, we apply the equitable considerations which we expressed in *In re Repco Products Corp., Repco Products Corp. v. Reliance Electric Co.*, Bankr. No. 83–02074S, Adv. No. 84–0763S, slip op. at 40–44, 100 B.R. 184, 201–02 (Bankr.E.D.Pa. May 8, 1989); and *Carlton House, supra*, 93 B.R. 867–72. Here, the equities in favor of the Plaintiffs arises from the fact that the Debtor did acquiesce in the overpayments. It appears that, while all of the $33,193.00 liability of the Plaintiffs did not arise pre-petition, at least as much as we are prepared to set off did. However, as in *Repco Products, supra*, at 202, we believe that a consequence of our allowing the Plaintiffs the practical financial advantage of set off is an elimination of the Plaintiffs' proof of claim.

The final issue is measurement of the setoff. The Plaintiffs' billings for March and April, 1988, uncontestedly total $20,914.50. *See* Finding of Fact 10, page 456 *supra*. We again turn to Mr. Dahlgren's reports and testimony and apply his conclusion that billings exceed collections by 14.7 percent. Finding of Fact 22, page 457 *supra*. Therefore, the Plaintiffs could have expected to recover 85.3 percent of $20,914.50, or $17,841.50. *See* Finding of Fact 23, page 457 *supra*. The Plaintiffs are therefore entitled to a setoff of $17,841.50

against their liability of $33,193.00 to the Debtors.

## E. CONCLUSION

In our accompanying Order, we therefore will enter judgment in favor of the Trustee for the difference, *i.e.*, $15,351.50.